THE STATE OF NEVADA, Respondent, v. LADELL McKAY, Appellant.

No. 3432

January 16, 1946. 165 P. 2d 389.

120

*George Lohse,* of Reno, for Appellant.

*Alan Bible,* Attorney General, *George P. Annand* and *Homer Mooney,* Deputy Attorneys General, of Carson City, and *Melvin E. Jepson,* District Attorney, and *Harold O. Taber* and *C. Lester Zahniser,* Assistant District Attorneys, all of Reno, for Respondent.

## OPINION

By the Court, HORSEY, J.:

The appellant, Ladell McKay, on the 25th day of January 1945 was convicted in the Second judicial district court, in and for the county of Washoe, of the crime of

murder in the first degree, for the killing of one Robert Flindt, and the jury before whom he was tried having failed in their verdict to fix the punishment, the trial court, on the 7th day of February 1945, pronounced judgment of death upon the appellant. From the said judgment and from the order of the trial court denying the appellant's motion for a new trial, appellant has appealed.

The appellant has presented seven assignments of error, which will be quoted hereafter, as they are considered.

In order to make clear to what extent the evidence should be detailed and considered in passing upon its sufficiency to justify the verdict and to prove the corpus delicti, it may be well at the outset to state briefly the respective positions and theories of the state and the appellant, as we understand them, from the testimony and from the briefs and arguments of respective counsel.

The state insists that the killing of Robert Flindt, by the appellant, at the time and place alleged in the information, was committed in the perpetration of the crime of robbery, and was, therefore, murder in the first degree. To establish such theory the state relies principally upon the testimony of Kenneth Earl Petsch, the only eyewitness other than the appellant to the striking, beating and kicking of the deceased, from which it appears that, without provocation, the appellant assaulted, severely beat and kicked the deceased, dragged him behind a fence, then kicked him again in the face, and thereupon robbed him by taking his wallet from his pocket. The state presented also the testimony of Marie Dollen as to a remark which she claimed was made by appellant to her in the Midway Bar when appellant was leaving there with Robert Flindt, the deceased, and said Kenneth Earl Petsch, to the effect that they were going "to take the kid (indicating Flindt by nodding toward him), for a walk," and that when he, appellant, returned he would have plenty of money and they would have a "hot" time (appellant denying that he said anything of

that sort). The state presented further the testimony of Dr. Lawrence Parsons, the autopsy surgeon, as to the nature of the injuries upon the body of the deceased and that he died from a cerebral hemorrhage shortly after the infliction of the injuries. The state presented also the testimony of Chief of Police Fletcher as to a statement which he testified the appellant made to him about noon on the day of the beating and death of Robert Flindt, in reply to a question of the chief as to why he dragged deceased behind the fence. Chief Fletcher said that the appellant stated to him that he didn't want anyone to see him rob Flindt.

On the other hand, the appellant, who testified as a witness in his own behalf, admitted that he repeatedly struck and beat the deceased at the time and place alleged, but denied that he kicked him, and claimed that the deceased, on two occasions in the Midway Bar, and upon a third occasion immediately before appellant struck deceased, made improper advances of a sexually perverted nature toward appellant, which made appellant very angry, and that his striking and beating of the deceased on East Fourth street in Reno, Nevada, near the Wagner Tank Company, on the early morning of November 26, 1944, was caused solely by such improper advances and the angry state of mind thereby produced in appellant, and without any intention to rob the deceased. Appellant testified he told Petsch about Flindt's improper advances and that he was "queer," which Petsch, in his testimony, did not remember. The appellant testified further he did not remember he made the statement to Chief of Police Fletcher that the chief testified that he made, in reply to the inquiry of why he dragged deceased behind the fence, to the effect that he did not want anyone to see him rob Flindt. The appellant testified that he must have been wrong to make the statement that he took Flindt's money after he dragged him behind the picket fence, and said: "After I took 'Kelly' back there, that is when I took his money. 'Kelly' was standing there." It will be observed that, contrary

to the testimony of "Kelly" Petsch, the appellant claims that, after dragging Flindt behind the picket fence, he went over to where "Kelly" was, and that he, appellant, then first formed the intention to rob; that the beating and striking of Flindt had occurred by reason of the improper advances, and that a considerable interval of time elapsed between the completion of the striking and beating and the formation of the intent to rob, and that appellant did not strike, beat or kick the deceased after taking him behind the picket fence, nor after he formed the intention to rob him; that, in fact, he never kicked Flindt at any time.

At the trial, in response to the question, "Why did you drag Flindt's body to the back of the fence?" McKay answered: "I don't know. I told you it was because I was drinking and I was mad, and that is all I know."

It is our understanding that appellant's counsel contends, solely upon the basis of the testimony of appellant, that the striking and beating, and the kicking of the deceased, if he was kicked, occurred in the heat of passion, upon provocation sufficient to excite an irresistible passion in the mind of a reasonable person, and that if death resulted, it could not be murder in the first degree, such killing not being willful, deliberate and premeditated, and not having been done in the perpetration, or attempt to perpetrate arson, rape, robbery or burglary; that a considerable period of time elapsed after the last of the physical acts constituting the killing and the formation of the intention to rob, so that the acts which produced the death of deceased could not be deemed to have any connection with the robbery; that if the provocation was not legally adequate to reduce the crime to manslaughter and yet, if the killing was under the influence of passion and, therefore, without express malice, and not willful, deliberate and premeditated, it would, at the most, be murder in the second degree.

In view of the conflict in the evidence upon material matters it is necessary, in order that we may determine justly as to appellant's first assignment of error, to-wit,

"That the verdict is contrary to the evidence and the law, and that the corpus delicti was not proven beyond a reasonable doubt," that we determine whether or not there is substantial evidence in the record in support of the verdict of the jury. To do so, it is essential that we review those portions of thè evidence that relate materially to the matters concerning which the evidence is in conflict. And, bearing in mind that appellant's assignment of error V is that the court erred in denying appellant's motion for a new trial, and particularly bearing in mind the third ground thereof, that the court's ruling in denying appellant's motion to remove the handcuffs prevented his having a fair and impartial trial within the meaning of the constitution, and was prejudicial to him, it is necessary to a proper determination of the matter, and to a fair understanding of the evidentiary basis for our conclusions, that we present the evidence herein much more fully than would be essential were the element of prejudicial influence from the shackling not involved.

Kenneth Earl Petsch, commonly known as "Kelly" Petsch, testified, in part, substantially as follows: That his business or occupation was working for the Oregon-Nevada-California, working on the dock and loading meat; that he lived at the Gallery Hotel in Reno and had lived in Reno since about the 15th of August 1944, and was steadily employed up until November 25, 1944; that he was acquainted with Ladell McKay, having first met him at Kenilworth, Utah, where they worked for a short time at a coal mine near there; that he saw appellant about two weeks before November 26, 1944, in Reno, Nevada, either at the Palace or the Bank Club, for a few minutes, and saw him down town for about a minute, just long enough to speak, on another occasion prior to Saturday night, November 25; that on Saturday night, November 25, 1944, the witness saw McKay at the Palace or the Bank Club; that witness was playing lottery and McKay was playing the dice; that witness did considerable drinking and McKay did some drinking,

too; that the witness and "Art" Mann had been drinking all evening, from the time they got off work until they got separated at the Bank or Palace Club; that after having several drinks there the witness and McKay had a drink at the La Fiesta, and from there went to a new place around the Depot Bar, drank there for quite some time, and upon leaving there went to the Midway, on East Fourth street, in Reno; that the witness could not remember how he got to the Midway, as he was pretty drunk, but remembered being there, in fact having intended to go there earlier in the evening; he could not recall what time in the evening they got there, but imagined it was about midnight; that he saw people at the Midway he knew, including Bart Kerr, Bob Flindt and his brother-in-law, Frank Rowe, and his wife, and that the witness knew the bartender, named "Van"; that Bob Flindt was the first one he recognized; that he had met Flindt about two weeks before, through Bart Kerr, the butcher; that on Saturday evening, November the 25th, when they again met at the Midway they had a conversation and Bob offered to buy the witness a drink, but witness said, "I will buy one"; that "Mack" and Bob were talking, but the witness did not know what their conversation was, as witness was talking to another boy, Glenn; that, as far as witness remembered, he had several drinks at the Midway; that witness could not fix the time when they left the Midway; that witness left with Bob Flindt and McKay; that witness realized the three of them left; that as they got to the Gallery, he recognized the sign and said, "I stay here, here is where I stay"; that witness did not know why the three of them left the Midway, could not remember whether he was too drunk and they were taking him home; that, as witness left the Midway Bar, Bob was with him and McKay was with him; that they were walking on the sidewalk and witness was in the middle and, as near as he could recall, McKay on the right-hand side and Bob was on the left; that they were walking down the sidewalk toward town, were going west; that

they were on the side of the street the Midway and Gallery are on—the south side of the street; that witness knew he said, "Here is where I stay," and that they talked among themselves and said witness was too drunk to go to bed, and that witness recalled they said, "You better walk around the block," and that they continued on, and that witness did not think he was too drunk to go to bed, but they insisted that he was; that they continued to walk on the sidewalk farther west, to the Wagner Tank, not quite in front of the Wagner Tank but right at the gateway that leads to the Wagner Tank; that there, all of a sudden, things broke loose, and McKay said, "You s—— of a b——," and he hauled off and hit Bob, and the witness turned around and stepped in and said, "What are you fighting for?" and witness stepped in to stop them, and that witness turned around and McKay hit witness right in the nose and knocked witness down, and that when he went to get up his eyes were watering and he was wiping the tears out of his eyes with his hand, and that witness got up with the intention of hitting McKay, and when he got up said to McKay, "What the h—— are you kicking him for? You will kill him," and McKay stuck his hand in his pocket (indicating) and told witness to stand back or he would get the same thing, and he told witness, "C——t, I didn't hurt him and you are going to go with me and you follow us," and he said, "Don't get too close," and he drug the boy behind the picket fence. That witness noticed, when McKay picked Bob up, Bob began to breathe heavier, and then they got over to the fence and McKay laid him down and he kicked him on the side of the face, and witness said, "J——s C——t, 'Mack,' you will kill that man," and McKay said, "C————t, don't be a G—— d—— sissy—I won't hurt him," and witness said, "I am going to take him to a hospital," and McKay said, "No, you are not. You are going with me," and he made an expression to go to Sacramento; then he said, "That is a swell place to hole up." Just before that, while Bob was still down and witness told McKay to quit kicking

him, McKay took something from Bob's pocket and McKay kept his right hand in his pocket and took his hand like that (indicating) and took something, and witness did not know what it was; that witness noticed blood was getting all over witness' shirt, and took his handkerchief and wiped it off, and McKay said "Have you another shirt?", and witness said, "Yes," and McKay said, "By G——, we will go up and get it and get a clean shirt, then." Witness further testified as follows:

"Q. After you were hit, did you see McKay strike Bob with his first? A. As I said, I was slightly dazed when I went down, and I know he hit him once and he must have hit him four or five times, and Bob lay in the middle of the sidewalk—he was just helpless when he was being kicked.

"Q. Did you get up off the ground shortly after Bob was knocked down? A. Yes, I must have. I got up as soon as I could and I wiped the tears from my eyes.

"Q. Were you bleeding from the nose at that time? A. I was so excited I didn't notice it at that time but no doubt that I was.

"Q. How did McKay handle Bob when he was dragging him from where he was to the back of the fence? A. He put his hands below his pits here (indicating) and drug him with his face up and left his feet drag.

"Q. Then you followed along? A. Yes. I didn't want to get shot and I thought he would shoot me too, when he done Bob the way he did he would never mind shooting me.

"Q. You followed while he was dragging Bob back of the fence, you followed a little behind? A. Yes, I done as he told me.

"Q. And you saw him go through Bob's pockets? A. With his left hand. He used his left hand.

"Q. What was the expression that McKay used to you? A. He said, 'You are going with me, big boy. We will go to Sacramento and hole up.'

"Q. And hole up? A. Yes."

The witness further testified to the effect that witness and McKay went to witness' room at the Gallery Hotel, witness changed his shirt, and then they went back to the Midway; that witness thought that when he got to the Midway he would then expose what happened, but there were women in there and he was afraid if he did it would get somebody all shot up and himself too, and he was thinking of getting some way to get Bob to the hospital and after he got in the Midway he kind of changed his mind, he was afraid of getting somebody else all shot up, that he believed McKay had a gun; that they were at the Midway about half an hour, called a cab, started out for the Cedars, but it was dark and closed up; then they came back to town to the Tropics, which was just closing; then they went to the Town House; that witness ordered a drink and sat at the bar and "Mack" went to the dressing room; that the witness then had the bartender call Irvin Blanchard and tell him that "Kelly" was in trouble and to come down, and soon Irvin came; that when Irvin came witness winked at him and he came and sat down, and witness introduced "Mack" to Irvin and soon they went to breakfast at the Monarch Cafe; that while there Roy Murray came, and Irvin, "Mack," Murray and the witness had breakfast together, and then witness and McKay got in the back seat of Irvin Blanchard's car and Irvin and Murray were in the front seat, and they drove down to 113 Elm street, where Blanchard lived, and witness went with Blanchard into his house and told him what had happened, and then Blanchard went out to the car and drove "Mack" and Murray down the street; that witness remained in Irvin's house; that witness' object in getting Blanchard was so witness could get away from McKay and to get Bob to the hospital; that after taking McKay down the street, Murray and Blanchard came back to 113 Elm street, and Murray, Blanchard and the witness then went, in Blanchard's car, from the latter's house down to East Fourth street to the vicinity of the Wagner Tank Company. That Roy Murray got out, that witness told

him right where the body was lying, and he went over and came back and said, "He is dead," and that they went to the police station and reported it; witness did not recall with whom he went back to where the body was, but thought it was a detective; that it was one of the Reno officers; that the witness was put under arrest; that McKay gave witness no money, that witness did not ask him for any money, and that witness had no plan with McKay to rob Flindt; that no such thing ever entered witness' mind.

The testimony of Bart Kerr, a witness for the state, was not important as to the controverted matters. He testified that he was present in the Midway Bar on Saturday night, November 25, or the early morning of the 26th, and saw Robert Flindt and Kenneth Petsch there. His testimony is in conformity to that of Petsch in regard to the incidents that happened there at that time. The witness testified that he knew Bob Flindt quite a while during his lifetime; that he didn't see Flindt make any improper advances to McKay during that evening at the Midway, and in all his associations with Bob Flindt he had never seen him make any improper advances to any other man or woman.

Robert Wirig testified that he was the taxi driver called to the Midway Bar on Sunday morning, November 26, and that there two men, a "large fellow" whom he identified as Kenneth Petsch, and a small man whom he identified as Ladell McKay, got in the taxi and that he drove them to the Cedars, and finding it closed returned to Reno, went to the Tropics, and, as it was closed, took them to the Town House, which they entered.

W. H. Brooks testified that he was the bartender at the Town House on the morning of November 26, 1944; that at about five o'clock that morning a couple of fellows came in and sat down at the lower end of the bar and ordered a couple of highballs; that the smaller one of the two went to the men's lavatory and held the door open while he was in there, and while he was there the

big fellow asked witness if witness would like to make three dollars, and the witness said he would, and the big fellow said, "I want you to call a man by the name of Blanchard, Irvin Blanchard, and tell him 'Kelly' is down here, but not to let the little man know you are doing the calling"; that the witness went back to the other end of the bar and called Blanchard and repeated the message that Petsch had given him; that in a few minutes Blanchard came, and sat down with the other two men and they had a drink and left soon thereafter; that the big man seemed extremely nervous about something and "he acted like there was something about the little fellow—he didn't want him to know about the telephone call, as though he were afraid of the man or something of the sort."

The testimony of Irvin Blanchard and of Roy Murray related to matters that occurred subsequent to the arrival of Petsch and McKay at the Town House. They each testified to going to breakfast with Petsch and McKay, then going in Blanchard's car to Blanchard's home, leaving Petsch there for awhile, taking McKay down town and letting him off where he indicated, as he said he was going to his hotel, then returning to Blanchard's house and, together with Petsch, driving to the Wagner Tank premises, where, in following Petsch's directions, they found the dead body of Flindt, and thereupon Petsch, Blanchard and Murray driving to the police station and reporting the matter.

Marie Dollen, a witness for the state, testified, in substance, that she arrived at the Midway Bar about 10:30 Saturday evening, November 25, 1944; that she was there quite a period of time; that she saw Mr. and Mrs. Rowe and Bart (Kerr), also Bob Flindt, there; that she also saw Kenneth Petsch, commonly called "Kelly," and Ladell McKay there; that she was sitting at the bar, near the telephone, and "Kelly" came up to use the telephone, and her drink was sitting in front of her and he ("Kelly") knocked it over in her lap and he didn't excuse himself and just left; that Bob Flindt was there, at the

other end of the bar; that she had no conversation with "Kelly" until they left, a while later; that they were standing at the other end of the bar and Bob (Flindt) and "this Kelly" and McKay got up and stood at the door; that "Kelly" made some remark to her, and she didn't catch all the remark, and she went to the door and asked what he said; that he and Bob were standing on the sidewalk and McKay came back, and that McKay said, "Never mind what he said. We are going to take this 'kid' for a walk and when I come back we will have plenty of money and we will have a 'hot' time"; that the witness saw Kelly and McKay there after that that evening; that she had called a cab to leave, and shortly before she left they came back to the Midway Bar, but Robert Flindt was not with them. Upon cross-examination Mrs. Dollen testified, in part, as follows:

"I just went to the door and asked what he said, and McKay came back upon the step, and Bob and 'Kelly' were standing on the sidewalk, and he said, 'Never mind, Honey, what he said,' and he said, 'We are going to take this kid for a walk' and he nodded toward Bob, 'and when we come back I will have plenty of money and we will have a "hot" time.' "

The witness was then asked if those were his exact words, and she answered, "Yes."

Gene Cowan, a police officer of Reno, testified for the state, in substance, that Roy Murray, Irvin Blanchard and Kenneth Petsch, whom he knew as "Kelly," a truck driver, came into the police station the morning of November 26, 1944, and reported a man as being dead down by the Wagner Tank, and the witness immediately went there, followed by police car No. 2, in which they brought Murray, Blanchard and Petsch, and that they found the body of Robert Flindt where it had been dragged behind the fence; that the Wagner Tank Company is located on East Fourth street, about the five hundred block, next to the Sanford Tractor and Equipment Company; that the witness examined the body, found the man was dead, and called the station to have

a coroner and undertaker called; that Robert Ebeling, Officer Nicora and the two gentlemen who discovered the body were with the witness at that time; that Kenneth Petsch said he was present when the affair took place and he described the man involved in the fight, that he knew him as "Mack" and he thought he stayed at the Richelieu Hotel; that the witness, Gene Cowan, left officer Ebeling there with the body until the arrival of the coroner, and, together with officer Nicora, witness went to the Richelieu Hotel, at Fourth and Evans streets, aroused the landlady, found McKay in bed in room 28, and arrested him, and that he was taken to the station and booked; that McKay at that time did not want to talk and did not ask witness why he was arrested. The witness being then shown state's exhibit A for identification, stated it was a bill fold that was picked up at the northeast corner of the Sanford Tractor building, adjoining the Wagner Tank Company; that it was in the gutter and the papers were scattered on the ground and the bill fold was empty when it was picked up, that there was no money in it whatever; that when the appellant was booked at the police station, on searching him one hundred and thirty-one dollars in currency was found on him; that the appellant refused to make a statement at the time he was booked.

Robert William Ebeling, a witness for the state, testified, in substance, to practically the same facts as the witness Cowan, and in addition thereto described to some extent the condition of the body of Flindt at the time that he saw the body lying on the south side of a board fence running parallel with Fourth street; that the body was lying parallel to the fence, on its back, the head was toward the east and the feet were set apart approximately a foot or more, that the face was turned to the north, the mouth was open; that witness tried to recognize the man but could not at that time; that his face was pretty badly bruised, there was a huge bump above the lower jaw, about the cheek, down below the ear, on the left side, and the jaw was pushed in in such

a manner, his mouth being open, that the teeth would not close, that is, if he were able to close his mouth his teeth would not meet; that the witness had met Robert Flindt several times in his lifetime, was acquainted with Flindt's brother, and had seen him about the garage on several occasions; that the witness was unable to recognize him at the time he saw his body that morning. The witness testified further to finding the wallet about fifteen steps west of the telephone pole, along the gutter, picking it up, and that some papers were in it and other papers immediately beside it on the sidewalk, and then officer Cowan returned and the witness turned the wallet over to him; that the witness didn't notice any money in the wallet; that the witness, on the way to the station, asked appellant if he knew a fellow by the name of McKay and he said, "I never heard of the guy"; that the witness asked him a couple of other questions and he refused to answer, and witness did not ask him any more.

Harry D. Fletcher, a witness for the state testified, substantially, that he was chief of police of Reno, Nevada, on November 26, 1944, and on that morning, at his office, he had a conversation with the appellant; that Mr. Jepson, Miss Brown, Captain Walter Cummings and the witness were present; that the appellant was apprised of his rights, no promises were made to him, that he was told that anything he might say might be used against him, and that he was advised as to the seriousness of the matter concerning which they were about to talk to him, and that anything he might say would be a voluntary statement on his part. The witness then testified what McKay stated to him. Omitting that portion relating to matters occurring before Petsch and McKay arrived at the Midway Bar, the witness narrated the statement of McKay to him, as follows: That about ten o'clock they went to the Midway Bar and started to drink at the Midway Bar, and there they met Bob Flindt. Bob Flindt was with some other

people at the time. It seems that "Kelly" Petsch had known Bob Flindt a week previous to this meeting at the Midway Bar. And that they had one or two drinks with Bob Flindt at the Midway and then "Kelly" Petsch started getting pretty drunk and it was decided to take him out and give him some air to sober him up; that appellant and Flindt took "Kelly" out and they started walking west on East Fourth street, and when opposite the Wagner Tank Company appellant struck Flindt, knocking him to the sidewalk; that Petsch tried to interfere and that appellant knocked Petsch down. That after knocking Flindt down, appellant dragged the body behind a picket fence about sixty feet from the sidewalk and went through his pockets and took what money he had; that appellant then stated to the witness, Chief Fletcher, that he and "Kelly" went to the Gallery Hotel, to Petsch's room, and cleaned Petsch up.

At that point the statement related to details of the happenings after leaving Petsch's room, which are immaterial and will be omitted.

The witness Fletcher further testified that in said statement appellant said he had struck Flindt four or five times, as the witness recalled; and then, without objection on the part of the defense, the witness was asked by the district attorney, "At that time and place did he state that he had been in trouble before?", and the witness answered, "Yes, he did." The witness was then asked if he recalled what appellant told him at that time, and the witness answered, "Yes, I do," and was then asked to give it as near as he could remember, and the witness answered:

"He stated that he had been in trouble in the State of Utah for stealing cars and burglary, and that he later joined the army, after getting out of this trouble, and had deserted while in the army, and later was arrested and escaped, and then he had a twenty-year sentence hanging over him; he stated he had escaped from the Lemoore Army Base in California; he said he went to

Fresno and from Fresno to San Francisco, and from San Francisco to Reno; that he had escaped from Lemoore October 29, 1944."

Asked if McKay made any statement as to why he attacked Flindt, the witness stated that he (McKay) said that Flindt had made improper advances toward him and that it had made him mad; that he referred to Flindt as a "queer"; that when asked why he took the money off of Flindt, McKay said he wanted it to gamble, to pay his room rent and eat. When asked why he dragged the body behind the picket fence, he said he didn't want anyone to see him rob Flindt.

The witness then testified:

"I remember that quite clearly. I also asked McKay, when he made the statement about Flindt, whether he could corroborate it or not, telling him at the time that was one of the oldest criminal tricks in the book in order to supply a motive, and he answered, 'Ask Petsch, he knows,' which I later did, and Petsch denied it; at that time McKay stated that he alone dragged the body behind the fence."

Dr. Lawrence Parsons, a Reno physician, testified that he performed a post mortem examination, on November 27, 1944, upon the body of Robert Flindt; that such post mortem examination was performed at the mortuary of O'Brien-Rogers, in Reno, at the instance and request of Judge Harry Dunseath, who was the coroner of the county; that his findings as the result of the examination were as follows:

"The body, embalmed, is that of a well nourished and developed white male, apparently of the stated age, 38 years. A large abrasion is present on the vertex of the scalp. The pupils are equal, regular, 6 mm. in diameter, and the sclerae are white. Numerous contusions and abrasions are found over the face. The right side of the face particularly is somewhat swollen in appearance, and an abrasion at the point of the chin is also slightly lacerated. There is extensive contusion of the scalp and

the temporal muscles. The brain shows diffuse sub-arachnoid hemorrhage, extensive subdural hemorrhage at its base, and all the ventricles are filled with fresh blood clot. The major branches of the circle Willis are normal. There is no skull fracture. Examination of the neck organs shows considerable contusion of the muscles covering the thyroid gland and outer surface of the larynx. The organs of the chest and abdomen are normal. The urinary bladder contains about 200 cc. of normal appearing urine.

"The Witness: Do you wish me to state my opinion of the immediate cause of death?

"Mr. Jepson: Yes.

"The Witness: 'Immediate cause of death: Cerebral hemorrhage due to contusions of head.'

"Mr. Jepson: Will you now, Doctor, explain what is meant by the word 'contusions'? A. We mean a bruise.
* * *

"Q. So, from your general examination of the body, it looked like it had been badly beaten, is that correct? A. Well, there were many bruises and abrasions which were undoubtedly the result of a number of successive applications of external violence."

On cross-examination the witness again stated that he found a large abrasion on the top of the head, that is, the so-called vertex of the skull, and upon being then asked by Mr. Lohse, appellant's attorney, whether, specifically, that was directly on the top of the head, or to the back or right or left, the witness answered that "by vertex we mean, and it is my intention to indicate, that it is directly on the top of the head. * * *"

Ladell McKay testified as a witness on his own behalf substantially as follows:

That Ladell McKay is his true name; that he was in Reno, Washoe County, Nevada, on the 25th day of November 1944; that he was residing then at the Lincoln Hotel on East Fourth street; that he came to Reno on the 19th or 20th of November; that on November 25,

1944, the witness was not up until about four o'clock; that he slept late that day; that when he got up he went to a show, was in the show possibly two and a half or three hours; that after he left the show he went to a cafe and ate, and after that went to the Bank Club; that he had about twenty-five dollars with him, so he started to gamble; that he was playing dice and must have won about ten dollars there, and soon he met "Kelly" Petsch; that he met Petsch around nine o'clock in the evening in the Bank Club; that Petsch was alone; that they drank for a while, beer and whiskey, at the bar at the club; that they continued to gamble between drinks; that the witness and Petsch were together drinking in there about an hour, then went to Harold's Club and then to some of the bars opposite the depot, and drank there; that Petsch told the witness that he would like to take the witness up to the Midway Bar, because he knew some people around there, some girls; that witness had never been to the Midway Bar and he did not know any-one who frequented that place, other than Petsch, before he went there, that he did not suggest going there, that Petsch suggested it to him; that witness imagined they got to the Midway about midnight; that the witness was introduced to several people in there and that Flindt was among the ones to whom he was introduced. The witness was then asked further questions by Mr. Lohse, his attorney, such questions and answers being as follows:

"Q. Did you visit with him at all after you met him? A. I just had a drink with him, I believe at the bar there.

"Q. What did you drink? A. I drank the same as him, beer.

"Q. Did you have any conversation with him? A. Not very much.

"Q. Just a casual conversation? A. Yes.

"Q. Do you remember any other people that you met at the bar? A. Not very well. I just remember some of them, what they looked like. I don't recall any of their names or anything.

Q. Then what happened? A. After I was there for a

while I went back to the rest room, and I was coming out of there and this was the first time that Flindt made an improper pass at me.

"Q. You said he did make an improper pass at you? A. Yes.

"Q. Where was that, again? A. Just coming out of the rest room in the back of the place.

"Q. Where was the rest room in reference to the bar? A. At the back end of the building.

"Q. Was there a partition between the bar and the rest room? A. Yes, and there is a kind of a doorway, a partition.

"You said you had been in the rest room? A. Yes.

"Q. And on leaving, Mr. Flindt did make an improper advance toward you? A. Yes.

"Q. Did you say anything to him at that time? A. No, I just threw it off and went back out to the bar and I was talking to some girl there when Flindt came back and sat beside me at the bar.

"Q. Then what happened? A. I don't know. We got started to talking, then, again—and there is where he asked me if I had a room, and he told me he was a pervert then, and I told him I didn't go for that kind of stuff and to lay off of me.

"Q. Then what took place? A. That is all the conversation I had with him.

"Q. Did you and Petsch have drinks after that? A. It was shortly after that I told Petsch about this Flindt, about what he was trying to do.

"Q. Was Petsch slightly under the influence of liquor at that time? A. Yes; he was very drunk, and I went back to the bar, and 'Kelly' was staggering, and I went over and asked if he wanted to be taken out, and he said he was getting kind of sick and some fresh air might do him some good."

The witness further testified that he had about fifty-five dollars when he left the Bank Club; that he started with twenty-five dollars and won about thirty dollars all together; that Petsch was awful drunk at the Midway

and making a nuisance of himself and that witness thought it would be best to take him out, and asked him if he wanted to go out; that Petsch was staggering and bumping people; the witness "never seen him have any arguments with anyone"; that then they started to leave the building, that "Kelly" was so big, "you know how big he is, and when he was staggering he took me too, and this Flindt came over and asked me if I wanted him to help me take 'Kelly' out, and I said, 'Yes.' "

"Q. Did anyone say anything to you as you were leaving? A. I remember this. I apologized to some woman for 'Kelly,' because when he is drunk he is very insulting toward women, and I already apologized to some woman at the Bank Club, and it happened again at the Midway.

"Q. Do you remember whether the woman you just made reference to was the same woman who was identified as Mrs. Dollen and testified here yesterday? A. That don't look like it. It looked like a much older woman.

"Q. Which woman do you mean was older? A. The woman I apologized to looked like a much older woman.

"Q. Did the woman to whom you apologized on behalf of Petsch come over to the doorway and come to the top of the steps? A. Yes, that is the way that happened.

"Q. What was the full extent of your conversation? A. I don't know. It seems 'Kelly' had sworn at her or something and I just told her—I apologized for 'Kelly', I told her he was drunk.

"Q. Did you tell her, 'Never mind, I will be back later with plenty of money and we will have a "hot" time'? A. No, I never said anything of the sort.

"Q. Are you positive you made no such statement? A. I am positive.

"Q. Then what took place? A. We just started down the sidewalk.

"Q. What was the relative position of the three of you? A. We were coming this way, west, and I was on the left side of Petsch and he was in the middle and Flindt was on the righthand side.

"Q. Please tell us what happened. A. We got out and walked a little and 'Kelly' said the fresh air had made him feel a little better.

"Q. When did he say that? A. I don't know. After we had gone half a block, maybe not that far.

"Q. Then what, if anything, was said? A. Then Flindt said, 'Maybe we better keep him walking and walk him around that block.'

"Q. Did Mr. Flindt make that statement? A. He did.

"Q. Are you positive Mr. Flindt did make that statement? A. Yes.

"Q. It was his suggestion? A. Yes.

"Q. Then what happened? A. We were walking along to Wagner's and that was the third time he made that pass at me, and I called him a name and hit him.

"Q. Did he resist your blow? A. After I hit him that first time 'Kelly' stepped in between and I guess it was me that hit 'Kelly,' but I don't think I hit him on purpose, it was just when we were in the road.

"Q. 'Kelly' stepped up between you and Flindt, and did he receive a blow? A. He did.

"Q. Did you or not strike 'Kelly' purposely? A. No, not on purpose, it was just he was in the road.

"Q. Did 'Kelly' make any apparent attempt to separate you and Mr. Flindt? A. No.

"Q. Then tell what happened. A. Then, after 'Kelly' was knocked down, me and Flindt just kept fighting until I knocked him down.

"Q. How large a man was this Flindt? A. About the same size I am.

"Q. About the same weight? A. I don't know.

"Q. Then what took place? A. I have not any definite reason why I picked him up and took him behind that fence.

"Q. You say you continued to fight with him—did he fall down. A. Yes, I knocked him down then.

"Q. Was he stretched out on the sidewalk? A. Yes.

"Q. In what position? A. He was facing east.

"Q. Was he on his back or side? A. On his back.

"Q. While he was down did you kick him? A. No, I never kicked him at all.

"Q. Are you positive you did not use your feet? A. Yes, I am awful positive that I never.

"Q. When he was lying on the sidewalk did Mr. Petsch appear and tell you you should stop fighting with Flindt? A. No, the way it was after I had knocked this Flindt down I took him behind the fence.

"Q. Did 'Kelly' say anything before that time to you? A. No.

"Q. Is the coat you are now wearing the coat you wore the night this altercation took place? A. Yes.

"Q. Did you carry a gun in your right or left hand pocket that night? A. I never carried a gun in my left or right hand pocket that night.

"Q. Did you put your hand in either pocket after Mr. Flindt was laying on the sidewalk and tell 'Kelly' Petsch to get away or get out, it was none of his business? A. No, I did not.

"Q. You positively didn't do that? A. No, I never.

"Q. Was Mr. Petsch still on the curb or on the sidewalk when you were fighting with Mr.—or rather after your fight with Flindt was Flindt lying on the sidewalk? A. Yes.

"Q. Then what happened? A. Then I took and drug Flindt behind this fence.

"Q. Did Petsch come in at that time and offer any resistance and ask you to stop or do anything to deter you? A. No.

"Q. You heard Petsch testify that he got up from the sidewalk after you had allegedly knocked him down and had told you to stop kicking the deceased. Is that true? A. No. The way it was, after I came out from behind the fence I came out and helped 'Kelly' to his feet.

"Q. Had he been sitting or lying on the curb all the time from the time he went down? A. When I came up he was sitting up.

"Q. Then what happened? A. When I came from behind the fence?

"Q. Between the time that Flindt first went down on the sidewalk, Mr. Petsch had not come to you and said or done anything whatever? A. No, I don't believe he could have got up on his feet himself.

"Q. Are you positive that he did not? A. Yes I am positive.

"Q. You said you carried Mr. Flindt from the sidewalk. A. Yes.

"Q. Will you please tell the jury how you did that? A. I picked him up underneath the arm pits.

"Q. With both hands? A. Yes.

"Q. How great a distance did you carry him? A. It must have been fifty feet or more, somewhere around there.

"Q. Then what did you do? A. I went back out and helped this 'Kelly' to his feet, and he asked me where Flindt was and I took him behind the fence and showed where he was.

"Q. Mr. McKay do you deny that you took Mr. Flindt's wallet from him? A. No, I don't deny it.

"Q. When did you take it? A. It was then, when I took 'Kelly' Petsch—you see 'Kelly' thought I was going to hit Flindt again.

"Q. When you went back to where Flindt was lying was that when you took the wallet? A. Yes.

"Q. You say 'Kelly' thought you were going to hit Flindt again? A. Yes. And that was when I went through his one pocket book and two front pockets.

"Q. Were you extremely angry when you first struck Mr. Flindt? A. Yes, I was, I was very mad all the time.

"Q. Did you determine to take Flindt's wallet before you struck the first blow? A. No. As I told you, I hit him for making the advances to me.

"Q. When, after the altercation, did you finally determine to take his wallet from him? A. That was when I took 'Kelly' behind the fence and showed him where he was.

"Q. When you went back the second time? A. Yes.

"Q. Are you positive that is the truth? A. Yes, I am positive.

"Q. As a matter of fact, you didn't have any intention to rob Mr. Flindt prior to the altercation or during the altercation? A. No, I never even thought about that.

"Q. That thought occurred to you after you took Petsch back to where Flindt was? A. Yes.

"Q. Did Petsch say anything to you about Mr. Flindt's condition? A. Mr. Flindt was laying there and he was breathing pretty heavily and 'Kelly' said he thought he was knocked out and we ought to get a doctor for him.

"Q. What did you say? A. I told him I thought he would be all right.

"Q. How much had you to drink during the course of that evening, Mr. McKay? A. I don't know exactly how much but it was quite a bit.

"Q. Were you drunk? A. Not to where I would stagger.

"Q. Were you drunk to the point where you could not remember what happened to you or what happened at all? A. No.

"Q. Would you say you had your full sensibilities? A. Most of them, yes.

"Q. After you removed Mr. Flindt's wallet then what happened? A. I put it in my righthand coat pocket.

"Q. Then what did you do? A. Me and 'Kelly' came out. After 'Kelly' and I came out from behind the fence I took the wallet again and took the money out of it and put it in my pocket and threw the wallet to the side.

"Q. Did you order Mr. Petsch to accompany you? A. No.

"Q. Did you put your right hand in your righthand coat pocket so that he gained the impression you had a gun with you, and did you tell him that you would take him to Sacramento and lay low or hide out? A. No. I put my wallet in my coat pocket.

"Q. Is that the only time you put your hand in your righthand coat pocket? A. Yes, when I put it in there and took it out again.

"Q. Then what took place? A. We were walking

toward 'Kelly's' apartment and we went up to his place and I helped him upstairs and we went to his room, and he had some blood on his shirt and coat and shoes, and we went in the bathroom and I brushed him off and he changed shirts and washed and shined his shoes up and we went back to the Midway Bar."

The witness further testified on direct examination, relating what transpired after the witness and Petsch left the scene of the crime, and such testimony was, in all important particulars, not different from the testimony of Petsch and the other witnesses for the state. There were two other matters referred to which, perhaps, should be here included. Appellant was asked by Mr. Lohse, "Did 'Kelly' Petsch say anything to you during those hours indicating that he was apprehensive over the condition of Flindt?" and he answered, "Well, he seemed kind of nervous over it, I know that," and at another point the following occurred:

"Q. Was it your intention when you became engaged in the altercation which resulted in Robert Flindt's death to do him fatal bodily injury? A. No.

"Q. And again I ask you, did you have in your mind a design or scheme to rob Robert Flindt? A. No I did not.

"Q. Before the fight ensued, or up to the time you took Petsch behind the fence and showed him Mr. Flindt, did you have any intention of taking Flindt's wallet? A. That was the first time I thought of it."

The witness McKay, interrogated on cross-examination by Mr. Jepson, testified, in part, that he had two hundred and fifty dollars when he came to Reno; that he got that from a friend he met while he was in the army, but he did not know how much he actually had when he came to Reno; that he bought his bus ticket and some clothes out of that; that after he was in Reno he spent his time gambling and drinking mostly—did not do any work at all; that he almost always would lose, gambling; that on November 25 he won about ten dollars at the Bank Club, had about thirty-five dollars when he left there, did some more gambling at Harold's Club, won twenty

dollars there; that made him have fifty-five dollars; that, after visiting with Petsch at various clubs and saloons mentioned, the witness had a little more than fifty dollars when he arrived at the Midway; that he paid for the taxi fare to the Midway and "Kelly" went with him; that they arrived there about midnight; that he was introduced to Bob Flindt at the Midway by "Kelly" and had one beer with Flindt; did not see "Bob" drinking anything other than beer that evening; went back to the rest room once, nobody went with him; that "Bob" Flindt made the improper pass just when he (McKay) came out the door of the rest room; that witness was not in the rest room with Flindt. Asked in what way, just what Flindt did when he made an improper pass at him, the witness said, "He was attempting to fool with my privates," and when asked, "How?" witness said, "with his hands"; that Flindt never said anything and that witness just shrugged him off and went out to the bar; that it was not in the rest room Flindt told witness he was a pervert, but at the bar—when he came back to the bar; that he was about five or six feet out from the bar, and that he told witness he was a "queer" and asked witness if he had a room somewhere where they could go; that they were then at the bar and just the two of them were having a drink at that time; that the witness had known Flindt just the short time while they were there; that witness answered, when Flindt told him that, that witness never went for that kind of stuff and to lay off of him, and the witness quit talking to him, that the witness didn't talk to him any more that evening, only he asked witness if witness wanted him to help walk "Kelly" and witness said, "Yes," if he wanted to he could; when "Kelly" was staggering he would take witness with him and witness said to "Bob," "Yes, If you want to help me, O. K." Asked if he was not afraid "Bob" might make improper advances to him then, the witness answered, "No I was not." Asked what happened at the Wagner Tank premises, the witness said that was where Flindt made another

advance at him; that Flindt "said nothing and he came around to my side again and he played with me and I called him a 's—— of a b——' and hit him"; that when they first got out a little ways "Kelly" said the air made him feel a little better and from then on he was not staggering so awful much; that the witness first complained to Petsch that "Bob" Flindt had made improper advances at him when the witness first came out of the toilet; that witness met "Kelly" there then—that he was standing by the nickelodeon; that no one else was standing with Petsch when he told him about Flindt making such advances; that witness "told him what that guy did to me * * * that he started to fool with me"; that he did not think Petsch said anything.

The witness testified further that he hit Flindt several times with the right hand and that, after Flindt was down, he picked him up and took him behind the fence; that, "I can not think of no reason, I was drinking."

Question by Mr. Jepson: "Do you recall that same morning over at the police station, when you were talking to the chief of police in my presence and in the presence of a lady there and another gentleman? A. Yes.

"Q. Can you recall the question was asked you why you dragged him behind the picket fence? A. No.

"Q. Do you recall that you made this answer, 'I don't know, I just didn't want to let anybody see me rob him, I guess'? A. Yes, but I never even robbed him then, I never even thought of robbing him then until—

"Q. Do you remember making that statement down there? A. No.

"Q. This question was asked you, 'What did you do after you drug him behind the picket fence?', answer, 'I told you I took his money', is that right? A. After I took 'Kelly' back there that is when I took his money. 'Kelly' was standing there.

"Q. Were you wrong when you made that statement the next morning, as I have given it to you here? A. I must have been. * * *

"Q. Why did you drag Flindt's body to the back of

the fence? A. I don't know. I told you it was because I was drinking and I was mad, and that is all I know.

"Q. 'Kelly' Petsch did not help you drag the body at all? A. No."

Upon appellant's first assignment of error, that the verdict is contrary to the evidence and the law, in that the corpus delicti was not proven beyond a reasonable doubt, the sole question for our determination is: "Was there substantial evidence adduced at the trial to support the verdict of the jury?"

The gist of appellant's testimony, bearing upon the points in conflict, is:

That the deceased made improper advances to him in the Midway Bar, attempting to "play" with him, and a little later, at the bar, telling him that deceased was a pervert, had asked him if he had a room; that appellant saw "Kelly" Petsch standing in the Midway Bar and told him about this and that Flindt was a "queer"; that he shrugged him off the first time, told him upon the second occasion that he "didn't go for that kind of stuff"; that later, when Flindt offered to go with him to take "Kelly" for a walk he consented and said, "O. K."; that he was not afraid of him and not afraid he would make further improper advances; that while they were walking on the sidewalk of East Fourth street the deceased walked around "Kelly," who was between them, and made another improper advance, starting to "play" with appellant; that appellant became very mad and hit him, striking him four or five times, and knocked him down, but "never kicked him at all"; that "Kelly" appeared to try to interfere after appellant hit deceased, stepping between them, and appellant knocked "Kelly" down; that "Kelly" did not get up and come over to where they were fighting and try to get him to quit, as "Kelly" testified he did, but remained where he had fallen on the sidewalk or curb; that appellant then dragged the deceased behind a picket fence near by, but at that time had no

intention of robbing him; that at one point in his testimony, on his direct examination, the appellant said: "I have not any definite reason why I picked him up and took him behind the fence." On cross-examination, to the question, "Why did you pick him up and put him behind the fence?" appellant answered, "I cannot think of no reason, I was drinking"; and later in the cross-examination he was asked, "Why did you drag Flindt's body in the back of the fence?" and answered, "I don't know. I told you it was because I was drinking and I was mad and that is all I know." On November 26, 1944, about noon, the appellant, when asked by Chief of Police Fletcher why he dragged Flindt behind the picket fence, answered, "I don't know. I just didn't want to let anybody see me rob him, I guess." At the trial appellant was asked if he remembered making said statement to Chief Feltcher, and answered, "No."

On the trial appellant insisted that he formed no intention to take Flindt's wallet until he took "Kelly" behind the fence and showed him where he was. He also said, "I went back out and helped 'Kelly' to his feet, and he asked me where Flindt was."

It will be remembered that "Kelly" Petsch did not remember appellant ever told him Flindt had made any improper advances to appellant or that Flindt was "queer." Petsch testified he saw or heard nothing unusual or indicating any improper advance, before the fight started; that he heard McKay call Flindt a "s—— of a b——" and then hit him. Petsch testified in detail about getting to his feet soon after he was knocked down, seeing McKay kick Flindt in the face, asking him what he was kicking him for, warning him that he might kill him, and then about following, at McKay's command, and seeing McKay drag Flindt behind the fence; that Petsch followed, and was just inside the fence when McKay laid Flindt down and then kicked him in the face. Petsch's testimony is clear, describing in detail what he

saw and heard, and is in direct conflict with McKay's claim that, after dragging Flindt behind the fence, he went and helped Petsch to his feet, and took him behind the fence, and showed him where Flindt was, and that he did not kick him.

Is Petsch's testimony, together with that of Chief of Police Fletcher and Dr. Lawrence Parsons and other witnesses for the state, upon the disputed points, substantial? Upon the question of whether McKay kicked Flindt, the physical facts, as found by Dr. Parsons at the autopsy, strongly corroborate Petsch and convincingly show that the deceased was kicked. The doctor testified he saw a large abrasion on the vertex of the scalp, and explained that by "vertex" is meant directly on top of the head, and upon inspecting the top of the scalp on the skull he noticed extensive bruising of the inner surface of the scalp and also of the temporal muscles. The doctor stated that the "immediate cause of death was: cerebral hemorrhage due to contusions of head."

It would have been impossible for a man standing on the surface of the ground to have hit another person of about the same height a blow with his fist directly on top of the head, or very improbable that any such blow of the fist would have been attempted after the man was knocked down and was lying on the ground; to administer such a blow the appellant would have had to kneel, and then the blow would have been ineffective if the fist alone were used. Certainly, a man thus kneeling could not have struck a blow with the bare fist, striking the hard surface of the head, that would have caused a large abrasion and the extensive bruising inside the skull which the doctor found. On the other hand, kicking would have been convenient, and the hard, sharp edges of the sole of a shoe would be calculated to produce the bruises and the abrasions evident on the body of the deceased.

■ If the appellant falsified as to this important matter, by claiming that he did not kick the deceased, the jurors were at liberty to seriously question his credibility

upon other disputed points, and to disregard his entire testimony, except insofar as it had been corroborated by other credible evidence, or by facts or circumstances proven on the trial. "Falsus in uno, falsus in omnibus." State v. Burns, 27 Nev. 289, 293, 74 P. 983, 984; Zelavin v. Tonopah Belmont Development Co., 39 Nev. 1, 11, 149 P. 188; Williams v. State, 9 Okl. Cr. 206, 131 P. 179.

In view of appellant's admission to Chief Fletcher by the words, "I don't know, I just didn't want to let anybody see me rob him, I guess," as the reason for dragging the body of Flindt behind the fence, which was a very sensible reason from the standpoint of one committing a robbery and fearing detection, the appellant's attempt at his trial to repudiate that statement and to substitute such excuses as that he was drinking and mad, or that he had no reason, which were not sensible reasons at all, clearly indicates that his spontaneous statement to Chief Fletcher constituted the true reason for dragging Flindt behind the fence, namely, to rob him. If appellant possessed the intention to rob Flindt at the time he dragged him behind the fence, is it not probable that he possessed such intention a few minutes before, when he first struck Flindt? (Petsch said the entire episode covered only from three to five minutes.) The appellant contends, however, that Flindt had made an improper advance to him, that this made him very angry and that then, in the sudden heat of passion caused by such provocation, he administered the beating which resulted in Flindt's death. He does not show any facts, nor explain why this particular improper advance, or insulting action by Flindt, if it occurred, affected him so differently from the previous improper advances by Flindt which he claims took place at the Midway Bar. Is it reasonable to believe that when he merely shrugged off, as he claims, the first of these advances, and upon the second occasion, as he claims, merely told Flindt to "lay off, he didn't go for that stuff," and then was entirely willing that Flindt go with him on the walk with Petsch, and said he did not fear him, that, on the third occasion,

as he claims, of another improper advance of the same nature as the others, he would have suddenly become so enraged that, for that cause alone, he would have beaten him to death, or so seriously that he would never have regained consciousness? Is it reasonable to believe that, if he thus did become so angry, and dragged Flindt behind the fence because he was drinking and mad, as he said on one occasion in his testimony, and knocked Petsch down shortly before, he would suddenly have become so kind, solicitous and compassionate as to Petsch that he would have gone to the trouble to help Petsch up and escort him over to show him where he had dragged Flindt behind the fence, or that he would suddenly have become so cool and calculating that he would for the first time then and there have formed the intention to rob Flindt? There is some consistency in expressions and reactions of the human mind; a provocation or cause sufficient to excite an irresistible passion in the mind of a reasonable person on one occasion is most likely, if similar in nature and surrounding circumstances, to excite an equal degree of passion on another occasion in the same person; and, conversely, if it is insufficiently to excite such passion and does not do so on one occasion, such provocation is most unlikely on another occasion, under like circumstances, to excite such passion. And such passion when once existent and manifesting itself in the cruel use of physical force, is not immediately replaced by compassionate kindliness and cool calculation.

Petsch's testimony, clear and convincing, completely denies the existence of the occasion upon which McKay claims the intention to rob the deceased arose, namely, when he went to assist Petsch to his feet and escort him to where Flindt was behind the fence, and the usual human emotions and reactions confirm Petsch. Reason and experience, together with the evidence in the record as to the effect upon appellant of the two prior improper advances which he claims occurred, and as to appellant's

background, likewise render most improbable the sudden heat of passion which he claims as the cause of his assault upon Flindt. In the light of the known fact and circumstances, and the admission of the appellant to Chief Fletcher of an intention to rob as the reason for dragging Flindt behind the picket fence only a few minutes after, as he claims, the alleged improper advance occurred, this claim of the appellant of the sudden heat of passion and that he dragged Flindt behind the fence without any intention to rob him, becomes fantastic and unreal. What, then, was the intention and the motive? The jurors had the right, from the evidence and from their reasoning and experience, to believe that the intention to rob was formed before the appellant called deceased the bad name and hit him, and that the motive was to obtain money. The appellant testified he had two hundred and fifty dollars shortly before arriving in Reno; that he spent some of it for clothes, bus fare and living expenses, but had the balance when he came—a substantial amount; that he had been in Reno five or six days, drinking and gambling mostly, and had not worked; that he had only twenty-five dollars when he started out the evening of November 25; that he won thirty dollars that evening before going to the Midway Bar, expended some money for a few drinks and taxi fare and had a little more than fifty dollars when he arrived at the Midway. From the evidence he seemed to have spent money very freely, having tipped the taxi driver four dollars on the occasion of the taxi ride with Petsch shortly after the trouble occurred. The appellant stated to Chief Fletcher, when asked why he took the money off Flindt, that he wanted it to gamble, pay his room rent and eat.

■ In view of the physical condition of the body of Flindt, plainly disclosing he had been kicked, and by reason of the inherent improbabilities of the appellant's statements in relation to the other controverted questions of fact, as compared to the clear and convincing

testimony of Kenneth Petsch, and the testimony of the other witnesses for the state having relation to the matters concerning which conflict in the evidence exists, we are impelled to the conclusion that there is substantial evidence in the record to support the verdict of the jury finding the appellant guilty of murder in the first degree. In fact, the evidence clearly and convincingly supports the verdict, and in our opinion no other verdict would have been justified in view of the evidence. It is asserted that the verdict is contrary to the evidence, and the law, in that the corpus delicti was not proven beyond a reasonable doubt, or at all.

■ Our constitution, art. VI, sec. 4, is to the effect that appeals to the supreme court in criminal cases can be taken on questions of law alone. We apprehend that the reason for this provision is that matters of fact and of evidence, such as the credibility of witness, and the weight to be given their testimony, are exclusively within the province of the jury. It is the rule, therefore, long established and consistently adhered to by this court, that if there is substantial evidence to support the verdict of the jury, the evidence will not be weighed by this court, nor the verdict or judgment disturbed, upon the alleged basis of the insufficiency of the evidence to sustain or justify the verdict. State v. Van Winkle, 6 Nev. 340; State v. Mills, 12 Nev. 403; State v. Buralli, 27 Nev. 41, 71 P. 532; State v. Hunter, 48 Nev. 358, 232 P. 778, 235 P. 645; State v. Boyle, 49 Nev. 386, 248 P. 48; State v. Watts, 53 Nev. 200, 296 P. 26. It follows that appellant's first assignment of error is without merit.

Assignments of error II, III and IV relate to the correctness of the proceedings at the trial and the ruling of the trial court upon appellant's motion to have the handcuffs removed from appellant's wrists.

The record discloses that on the morning of January 25, 1944, the same being the second day of the trial, Mr. Lohse, attorney for the defendant, said:

"Before we proceed, I move the court at this time that

the court enter an order directing the sheriff to remove the handcuffs from the defendant, on the ground his presence in court with handcuffs is prejudicial to the defendant. There are two deputies here, who, I am sure, are capable of keeping his custody while he is in court. The handcuffs should be removed."

The court thereupon stated:

"That is a matter entirely within the discretion of the sheriff. The motion is denied. In other words, I am not running the office of the sheriff."

Assignment of error II states, "that the trial court erred in denying that the court had discretion in determining whether or not a defendant should be shackled during the course of the trial."

■■ Undoubtedly the trial court made an erroneous statement in connection with the ruling, as to the reason therefor, notwithstanding which, the court did exercise its discretion by deying the motion. The statement was erroneous in indicating that discretion in the matter was entirely or exclusively in the sheriff. Practically all of the authorities dealing with the question state that the discretion of determining, in a particular case, whether or not the exceptional conditions of fact permitting or justifying shackling are existent, is in the trial court, and that the exercise of such discretion will not be interfered with unless that discretion was abused. 16 C. J. p. 819; 23 C. J. S., Criminal Law, sec. 977, p. 313; 8 R. C. L. 68; 14 Am. Jur. 855. It is our view that the right of a defendant to be free from shackles and manacle at his trial is an important right guaranteed by our constitution and laws, by their provisions for a fair and impartial trial and establishing the right of one accused of crime to be free to defend himself. Permitting a defendant to be shackled during his trial is legally justifiable only upon the trial court having found, in the exercise of its *judicial* discretion, in the particular case, the existence of the exceptional conditions, of fact and circumstance, reasonably rendering necessary a departure

from this wholesome and salutary general rule against shackling and manacling. (Italics ours.)

■ It has been held, however, and we believe generally conceded, that a sheriff, charged with the responsibility of safely keeping a person, has the right, in his discretion, to handcuff one charged with murder or other felonious crime when he is being taken from and to the court. Donehy & Prather v. Com., 170 Ky. 474, 186 S. W. 161, 3 A. L. R. 1161.

It appears from the record that the trial court in ruling upon appellant's motion for a new trial, referred to the court's ruling upon the previous motion to remove the shackles from appellant, and stated:

"Defendant was escorted from the jail and into the courtroom for his trial with handcuffs on his wrists. On the second day of the trial defendant's attorney moved the Court for an order directing the Sheriff to remove the handcuffs from the defendant, on the ground that 'his presence in Court with handcuffs is prejudicial to the defendant.' Nothing was then offered to show, or even indicate, how or in what manner the defendant was prejudiced by remaining in Court with handcuffs, said attorney simply stating:

" 'There are two deputies here, who, I am sure, are capable of keeping his custody while he is in Court, the handcuffs should be removed.'

"The denial of that motion is now urged as one of the reasons for asking for a new trial.

"At that time I knew that the defendant had previously been convicted of burglary, had served a term in the Utah penitentiary, had deserted from the armed forces of the United States, had been sentenced to twenty years' imprisonment, had escaped from a military guard house, had registered in Reno under an assumed name, and had attempted to escape from the Washoe County jail. I had also been advised that while in the Washoe County jail the defendant had attempted to procure some hack saws in order to escape therefrom, at the time stating, in effect, that he could not secure his

liberty legally. I had also been advised that the Sheriff and his deputies actually believed it necessary to keep the defendant handcuffed in Court in order to prevent his attempting to escape.

"Some of these facts were then known to the members of the jury, having been divulged to them by defendant's counsel in his examination touching their qualifications as jurors. All of them were then known to the Sheriff and his deputies.

"I denied the motion of defendant's counsel, because I deemed handcuffs necessary for defendant's safe detention and because I believed the Sheriff was fully justified in keeping the defendant handcuffed. If I erred in not so stating to the jury or in not then stating the facts which supported my conclusions, which I do not concede, such error was certainly not prejudicial to the defendant."

■ It is clear from the foregoing statement of the trial court that the trial judge possessed information of certain past criminal acts of appellant, from statements made by counsel for appellant in examining the jurors, and information as to such acts from other sources, principally, no doubt, from the sheriff of Washoe County, an officer of the court. It is believed the trial judge possessed sufficient information and knowledge to enable him properly to exercise his discretion in ruling upon the motion to remove the shackles from appellant, and that, while his words indicated he was deferring to the sheriff's discretion he was merely giving proper heed, as he had the right to do, to the sheriff's knowledge of the record, tendencies and character of appellant and to his recommendation as an officer of the court, in relation to the necessity of keeping appellant handcuffed during his trial in order to prevent his escape.

Regardless of the fact that the trial judge stated an erroneous reason for his ruling, the trial court did not decline to rule, but in the light of the knowledge which the trial judge then possessed, did actually and advisedly

exercise the court's discretion by denying appellant's motion to remove the handcuffs.

On page 9 of his brief, in support of appellant's assignment of error II, the attorney for appellant stated that there was no evidence before the court of any such improper conduct, and that the state offered no evidence in opposition to defendant's motion to remove the handcuffs, at the time it was made.

■ It has been repeatedly held, in effect, that, upon a motion to remove shackles or handcuffs from a defendant, the court has the right to take into consideration knowledge acquired outside of formal evidence offered and admitted at the trial. In Gray v. State, 9 Tex. Cr. R. 305, 268 S. W. 941, on page 944, 269 S. W. 1056, there appears a statement of the trial judge as follows:

"Examined and approved with this explanation: I also talked with the sheriff of Titus county, and Capt. Nichols, of the ranger service, who was assisting the sheriff during court. They both told me that it was unsafe to take the handcuffs off. I was opposed to trying him with the handcuffs on, and so stated to the officers, talking on more occasions than one during the progress of the trial to the sheriff and ranger and deputies. Capt. Nichols advanced this reason for keeping the handcuffs on. He said defendant was desperate, and in all probability was bent on self-destruction, and would very likely try to secure some deputy's pistol and create a stampede in the courtroom, and possibly deliberately do something to force the officers to kill him. I kept the handcuffs on him at the request of the officers. Besides, they were very small silver-plated cuffs, and were not in view when defendant was sitting down. He could easily slip them back under his coat sleeves and could use his hands very well."

At that point in the opinion, the appellate court said:

"Taking note of the evidence before the trial judge, and the information by which he was impelled, we feel that this court would not be warranted in concluding

that the record reflects an abuse of the discretion which the law vested in the trial court."

In Hall v. State 199 Ind. 592, 159 N. E. 420, 424, the court, in passing upon a contention of appellant similar to that we are now called upon to consider, expressed the opinion that appellant's contention that the knowledge upon which a court bases its discretion to refuse a prisoner's request that fetters be removed from his legs must come only from evidence offered at the trial, was unsound, the language of the Supreme Court of Indiana in that connection being:

"Appellant's contention that the knowledge upon which a court bases its discretion to refuse a prisoner's request that fetters be removed from his legs must come only from evidence offered at the trial does not appear to us to be sound. The court, in ruling upon appellant's motion or request, stated certain facts upon which it exercised its discretion and based its decision. If the appellant contended that the facts so stated by the court were untrue, he should have controverted them, and asked permission to show the true facts to the court by proper sworn testimony. But this he did not do, and there is nothing in the record to show that the facts stated by the court were untrue, but, on the contrary, facts were disclosed in evidence showing a very desperate and determined effort by appellant to escape when he disarmed an officer and used his revolver, and was finally quelled only when the sheriff threatened to gas the jail.

"Evidence to the effect that this appellant had secured a revolver and shot at the sheriff, and attempted to escape, that his co-defendant had escaped, and that efforts might be made to release the prisoner during the trial, it seems to us to be more to his damage than the fact that he sat during the trial with his feet fettered. See Faire v. State, 1877, 58 Ala. 74, 82."

In the instant case, the learned trial judge in ruling upon appellant's motion for a new trial, expressed a similar idea in the following language:

"If I erred in not so stating to the jury, or in not then stating the facts which supported my conclusion, which I do not concede, such error was certainly not prejudicial to the defendant."

In Makley v. State, 49 Ohio App. 359, 197 N. E. 339, on page 346, it is stated in the opinion of Guernsey, J.:

"The case of Hall v. State, supra, is also authority for the proposition that the knowledge, upon which a court bases its discretion to refuse the prisoner's request that fetters be removed from his legs, need not come exclusively from evidence offered at the trial, and it would seem clear that upon passing upon such request the court, in addition to considering the evidence developed at the trial, would have the right and duty to consider facts developed by the evidence on the trial of an accomplice immediately preceding the trial of the defendant, and should take judicial notice of facts generally known within the limits of its jurisdiction. The principle upon which this conclusion is based is well expressed by Judge Wanamaker in the opinion in the case of Barnett v. State, 104 Ohio St. 298, at page 310, 135 N. E. 647, 651, 27 A. L. R. 351, in the following words: 'What we know as men, having common knowledge, * * * we cannot ignore as judges.'"

In view of the foregoing facts and authorities, there appears to be no merit to appellant's assignments of error II and III.

Appellant's assignment of error IV is that: "The trial court erred in denying defendant's motion to have the handcuffs removed, which prejudiced appellant before the jury, and thus denied him a fair and impartial trial as guaranteed by the constitution of Nevada, and the United States constitution."

In this assignment of error the question confronting us is: Did the trial court, in view of the knowledge which the trial judge then possessed as to the past criminal acts, conduct and character of the appellant, abuse the trial court's discretion in denying the appellant's motion that the handcuffs be removed?

From a very early time in the evolution of the common law it was recognized that a person accused of crime, in order to be able adequately and efficiently to defend himself, should be, especially at his trial, free from the physical handicap, mental embarrassment, mortification and perhaps impairment, and the prejudicial influence, of manacles and shackles. This right has been fully recognized and cherished by authorities in all countries, including the United States, in which the Anglo Saxon system of jurisprudence prevails. In the United States, our federal constitution and most state constitutions, including the constitution of the State of Nevada, contain provisions to guarantee to one accused of crime the right to a fair and impartial trial, and to make certain that he has full and fair opportunity for his defense.

In our Nevada criminal practice act, chapter 1, sec. 7, occurs a provision prohibiting unnecessary restraint, before conviction of one accused of crime, said provision, sec. 10656 N. C. L., vol. 5, 1929, being as follows:

"Sec. 10656. Witness Against Self — Unnecessary Restraint. Sec. 7. No person can be compelled, in a criminal action, to be a witness against himself, nor shall a person charged with a public offense be subjected, before conviction, to any more restraint than is necessary for his detention to answer the charge."

The rule against unnecessary shackling, or manacling, was stated by the learned Sir William Blackstone, as follows:

"The prisoner must be brought to the bar without irons or in any manner of shackles or bonds, unless there be evident danger of escape, and then he may be secured with irons." 4 Bl. Comm. 332.

This rule, as developed and applied, generally, in both the federal and state courts, is very well stated in 8 R. C. L. 68, and in 14 Am. Jur. 855, in the following identical language:

"Right to be Free from Shackles or Custody of Officers.—At early common law when a prisoner was

brought into the court for trial, upon his plea of not guilty to an indictment for a criminal offense, he was entitled to make his appearance free from all shackles or bonds. This is his right today in the United States. The spirit of the law is that a prisoner, upon his trial before a jury, shall have the unrestrained use of his limbs and shall not suffer any physical bond or burden which might tend to confuse or embarrass his mental faculties. Furthermore, a prejudice might be created in the minds of the jury against a prisoner who had been brought before them handcuffed and shackled, which might interfere with a fair and just decision on the question of the guilt or innocence of such person. It is recognized that it lies within the discretion of the trial court to have a prisoner shackled when it is manifest that such a precaution is necessary to prevent violence or escape, and that appellate courts will not reverse the trial court's action except in a clear case of abuse of discretion. In exercising this discretion the court must have some reason, based on the conduct of the prisoner at the time of the trial, to authorize so important a right to be forfeited. There must be some immediate necessity for the use of shackles. * * *"

In 23 C. J. S., Criminal Law, sec. 977, p. 313, the rule, in more condensed form, is stated as follows:

"Shackling accused. During the trial accused should be free from shackles except in so far as the trial court, in its sound discretion, deems it necessary to prevent the escape of accused or his forcible release, to restrain him from doing violence to others, or from injuring himself, or to prevent such misconduct as would obstruct the work of the court; and such exceptions apply particularly while the accused is being brought into or taken from court."

■ We agree with Hawkins, J., in the opinion on rehearing in Gray v. State, Tex., 268 S. W. at page 949, in the following statement of the rule:

"From an examination of the text books, and the decisions cited in our original opinion and here, as well as

many other authorities collated by Wharton and Bishop, and referred to in some of the cases mentioned, the rule may be fairly stated that if the record discloses no good reason for having the prisoner manacled during the trial the same will be cause for reversal; on the other hand, if, in the sound discretion of the court, it appears necessary to retain his shackles to prevent the escape or self-destruction of the prisoner, or to prevent him from injuring bystanders or officers of the court, or if necessary to maintain a quiet and peaceable trial, the court may try the prisoner without having the shackles removed; this action being subject to the closest scrutiny and review by the appellate court."

Especially do we approve the statement to the effect that the action of the trial court upon permitting a prisoner to be tried without the removal of shackles upon the ground of necessity shall be "subject to the closest scrutiny and review by the appellate court." We agree also with, and heartily approve, the further statement of the learned judge in 268 S. W. on page 950 of the said opinion that, "we desire to make it perfectly plain that we regard a trial with the prisoner in irons as obnoxious to the spirit of our laws and all ideas of justice, and it is only when the record brings the case clearly within one of the rare exceptions that we would consent for a conviction to stand. Before a judge should permit a case to proceed under such circumstances, he should be very sure of his ground."

Practically all of the authorities however, we dare say, from the earliest inception of the rule against compelling a defendant to be shackled or manacled at his trial, agree that, under extreme and exceptional circumstances, indicating that such restraint is reasonably necessary for the protection of innocent persons from violence, or the prevention of escape, or the maintenance of orderly judicial proceedings, or the protection of the defendant himself from self-destruction, the keeping of the defendant under restraint by shackles or manacles is proper.

What are the facts as to appellant Ladell McKay? He

acknowledged, in his testimony as a witness on his own behalf at his trial, that he was convicted in Utah and sentenced to the Utah penitentiary for second degree burglary; that he was arrested twice before that for car theft; and that while he was out on parole from the Utah penitentiary, he was drafted into the army, and that he was convicted by army court martial for desertion and was sentenced to twenty years imprisonment therefor.

In addition to having knowledge of the foregoing past criminal record, except perhaps as to the auto thefts, the trial court, upon ruling upon appellant's motion for a new trial, stated that at the time he ruled on the motion to remove the shackles he then knew that the defendant had escaped from a military guard house and had attempted to escape from the Washoe County jail.

Upon the trial, but after the ruling upon the motion to remove the shackles, Chief of Police Harry D. Fletcher, of Reno, testified that the defendant, on the same day of his arrest, stated to him that he, the defendant, deserted while in the army and later was arrested and escaped from the Lemoore Army Base in California; and Edwin Gily, a deputy sheriff of Washoe County, testified at the trial, but after said ruling upon the said motion, that the defendant, on the morning of January 22, 1944 (two days before the commencement of his trial), tried to break out of the Washoe County jail; that the witness and one Gray were in the said jail and heard an unusual noise inside the tank; that they sat there and talked a few minutes and Gily took off his shoes and sneaked over to where he could look inside the tank, and he could see the appellant trying to pry the control box door open; that the control box is a lever that opens the main door to the tank, in which the appellant and others were confined; that the appellant had an iron bar, approximately three feet long by three eights of an inch wide, and that when the witness looked in, the appellant was prying on the control box; that if

he had succeeded in prying the door of the control box open, he might have opened the door of the tank in which he was confined; that he damaged the control box to the extent that they were unable to open it with a key, and that it was all bent out of shape and Gily had to get a locksmith to open it.

In view of the knowledge which the trial court undoubtedly had, at the time of ruling upon appellant's motion that the shackles be removed, which knowledge was later confirmed at the trial by the appellant himself in his testimony, and by Chief Fletcher from what appellant had stated to him, and by the witness Gily as to the attempted escape by appellant from the Washoe County jail only two days before his trial for murder (at a time when one other than a desperate man would have wished to make the best possible impression), the conclusion is fully justified that the appellant was, at the time of the said ruling of the court declining to permit the removal of the handcuffs, a dangerous and desperate man, and that the sheriff, his deputies and the court were reasonably justified in apprehending that the appellant, if the handcuffs were removed, might at any time, even at the time of the trial, attempt to escape, and that he might resort to any available means of physical violence to accomplish such escape.

The appellant, by his own conduct, was the primary cause of any prejudice his being handcuffed might entail. ■ In view of the exceptional facts and circumstances existing, and within the knowledge of the trial judge, as above outlined, at the time of the ruling, we cannot conscientiously say that the trial court abused its discretion in denying the motion to remove the handcuffs. There is no merit, therefore, to appellant's assignment of error IV.

There are numerous authorities, of course, which, under ordinary circumstances not disclosing that the defendant had a particularly bad record, nor that he had indicated an intent to escape or to employ violence, nor

that in other respects he was dangerous, have held shackling or manacling, under the particular circumstances existing in those cases, to be unjustified.

Cases so holding, and which have frequently been referred to as leading cases, are: State v. Kring, 1 Mo. App. 438, also Id., 64 Mo. 591; People v. Harrington, 42 Cal. 165, 10 Am. Rep. 296; and State v. Williams, 18 Wash. 47, 50 P. 580, 39 L. R. A. 821, 63 Am. St. Rep. 869. See, also: 1 Bishop Crim. Proc. sec. 955; Wharton P. & Prac. sec. 540; and State v. Smith, 11 Or. 205, 8 P. 343.

The qualification of the general rule, which is very generally applied under extreme and exceptional circumstances, is well stated in Bishop's New Crim. Proc., 2d ed., vol. 2, section 955, to be:

"In extreme and exceptional cases, where the safe custody of the prisoner and the peace of the tribunal imperatively demand, the manacles may be retained."

Some of the cases in which the facts have been deemed sufficiently exceptional and extreme to justify departure from the general rule, and which, in essentials are similar to the instant case, are: Faire v. State, 58 Ala. 74; Territory of New Mexico v. Kelly, 2 N. M. 292; Hall v. State, supra; Gray v. State, supra; People v. Kimball, 5 Cal. 2d 608, 55 P. 2d 483; State v. Bryan, 69 Ohio App. 306, 43 N. E. 2d 625; Rayburn v. State, 200 Ark. 914, 141 S. W. 2d 532; and Com. v. Millen, 289 Mass. 441, 194 N. E. 463, 480.

Such cases as Makley v. State, supra, and Pierpont v. State, 49 Ohio App. 77, 195 N. E. 264 (the defendants in each of said cases being members of the Dillinger gang), and McDonald v. United States, 8 Cir., 89 F. 2d 128 (defendant being a member of the Barker-Carpis gang), we have not cited with the foregoing authorities in support of our position, for the reason that the defendants in those cases, being members of notorious criminal gangs or groups of extreme desperateness and depravity, were in a class more extreme in degree than any to

which appellant, in the instant case, could be fairly assigned.

For convenience we will treat assignments of error V, VI and VII inversely.

Assignment VII is that the trial court erred in admitting in evidence the affidavit of Sheriff Ray Root. In support of this assignment the appellant contends: (1) That the affidavit, being ex parte, and not allowing for cross-examination, is not admissible; (2) that the statements therein are hearsay; and (3) that the statements therein are not material to the issues of the case.

■ The affidavit of Sheriff Root was to the effect that he had "learned" that appellant "had escaped from the guard house at an army camp at Lemoore, California"; and further, that he had been confined and had served time in the Utah State penitentiary, at Salt Lake City, Utah, for burglary. "That on or about January 2nd affiant had received information from the Federal Bureau of Investigation that a letter had been written by Ladell McKay to one Miss Mary Davis, Panguitch, Utah, wherein the said McKay asked Miss Davis to send him a box with some hack saw blades in it * * * and instructed her as to steps she should take to conceal the blades." The affidavit further, as of affiant's own knowledge, stated facts as to Ladell McKay's attempt to break out of the Washoe County jail January 22d (1944), by springing the door of the control box which controls the entrance door to the section in which he was confined. The affidavit further stated that "in view of his information and knowledge of the character of defendant that affiant cautioned and warned all his men and deputies to take no chances in permitting the said Ladell McKay to escape, and that affiant deemed it necessary to prevent his escape and for the safety of the court attaches, spectators and all parties in and about the court house, that the said Ladell McKay be handcuffed at all times while he was out of the jail."

It is apparent that, as to the escape of appellant from

the guard house at the army camp at Lemoore, California, and as to appellant's having been confined in the penitentiary at Salt Lake City, Utah, for burglary, also as to the information in regard to appellant's letter to Mary Davis, the affiant's statements are based upon hearsay. As to the first two occurrences above stated, he stated he "learned" of them, without disclosing any source. While the information may have come to him officially from some Utah officers or officers as to appellant's having been confined and having served a term in the Utah penitentiary, and from a military officer or officers as to the escape from the army base at Lemoore, California, such information may have been received merely from a bystander in Reno or elsewhere, inasmuch as affiant has failed, as to both these instances, to disclose the source of his information.

In regard to the information received through the federal bureau of investigation it is not disclosed whether the information imparted to affiant was from an official of the F. B. I. who had personally seen the letter, or from some official of that organization who received the information from another F. B. I. official or agent who knew the facts, or whether the information came second or third handed from a person or persons not officially connected with the F. B. I. who reported the so-called information to that organization.

The portions of the affidavit relating to past offenses and having no relation to the instant case, namely, his having been confined in the Utah penitentiary for burglary and having escaped from the guard house at the army camp at Lemoore, California, were inadmissible, upon the motion for a new trial, also upon the further ground that such evidence is incompetent and irrelevant to tend to show the guilt of the appellant in the instant case, or that the evidence is sufficient to justify the verdict. Such evidence, if same were not hearsay, and if it were offered for the purpose only of assisting the trial court in determining, upon the motion for a new trial, the correctness of the former ruling denying appellant's

motion to remove the handcuffs, could have been admitted properly for that purpose only, and to render it admissible for that special purpose, the trial court would necessarily have had to restrict or limit its reception to that purpose. This the trial court did not do. Therefore, the portions of the affidavit relating to the first two matters above mentioned were inadmissible as hearsay, and also because of the relation to past offenses having no connection with the instant case, and the court, in ruling as to their admissibility, not having confined the same to the purposes and effect of showing only the past criminal record and character, as tending to show, upon the motion for a new trial, the correctness of the court's ruling as to removing the handcuffs. To sanction the action of the trial judge, when ruling upon the incidental matter of shackling or handcuffing, at the commencement of the trial, under conditions in the nature of an emergency, with little or no time to obtain legal evidence, in acting upon the basis of his own knowledge and best available information received outside of court, even though hearsay, as to the defendant's criminal record and character, in order to determine whether shackling was necessary, is a very different matter from sanctioning his acting upon such a basis at the trial, or upon a motion for a new trial, when ruling as to the competency or character of evidence which is admissible. As to the incidental matter of shackling, legal evidence duly offered and introduced in a formal proceeding is held not essential. This is generally stated by the authorities, some of which have been cited in this opinion. At the trial, or upon a motion for a new trial, the one involving, as it does, the issue of the guilt or innocence of the defendant, and the other the sufficiency of the evidence to sustain the verdict of guilty, the issues involved are of too great importance and are too far reaching in their consequences to permit anything but competent, relevant and material evidence to be received.

We are confronted with a different situation as to the portion of the affidavit relating to the letter

alleged to have been written by appellant to Mary Davis requesting that hack saw blades be sent him, from that before us in regard to the above-mentioned portions of the affidavit dealing with the alleged past offenses of appellant. The portion of the affidavit relating to the said letter is inadmissible because same is hearsay, and also for the further reason that, although, ordinarily, such evidence, being in relation to an intended attempt to escape from incarceration in connection with the case at bar, would be relevant and material at the trial to show consciousness of guilt and fear of consequences (16 C. J. 554; 22 C. J. S., Criminal Law, sec. 631), it would, of course, not be proper for that purpose, after the trial, and upon motion for a new trial upon the ground of the insufficiency of the evidence to justify the verdict. No evidence would be proper upon a motion for a new trial that was proper, relevant or material to the issues at the trial, involving the guilt or innocence of the defendant, and not there introduced. In other words, the case cannot be reopened on a motion for a new trial, and new evidence, which would have been proper to have been admitted in chief at the trial, be allowed after the jury has rendered its verdict and been discharged. To do so would permit strengthening, retroactively, the basis of the verdict. Only the evidence admitted at the trial, and before the case was finally submitted to the jury, can be considered upon a motion for a new trial in determining the sufficiency or insufficiency of the evidence to justify the verdict. This appears elementary. This evidence of the letter to Mary Davis, if it had not been hearsay, would have been admissible for the purpose only of showing, upon the motion for a new trial, the appellant to be a desperate and dangerous character, and to make clear the justification of the trial court's ruling declining to order the handcuffs removed, and hence to show that a new trial because of the trial court's having allowed the handcuffs to remain was unjustifiable; but, in order to render the evidence admissible for that purpose, the court, as above pointed out, must have expressly confined

its admissibility and use to that purpose. The record does not show that the trial court did this.

■ The portion of the affidavit which narrated the attempted escape by appellant from the Washoe County jail January 22, 1944, and all other portions of the affidavit not above specifically mentioned, stated facts within the affiant's own knowledge, and, therefore, were not hearsay, and would have been admissible to show the criminal and desperate character of appellant, for the purpose of showing the reasonable necessity of keeping him handcuffed at the time of the trial and the correctness of the court's ruling in declining to order the handcuffs removed, if the court had confined its admission, and use as evidence, to that purpose only, but it does not appear from the record that the trial court did thus confine or restrict the admission and use of the affidavit. When it was admitted upon the hearing of appellant's motion for a new trial, its admission in evidence, without any such restriction, was erroneous.

For the reasons stated, appellant's assignment of error VII has merit.

We will now consider the law and the authorities relative to appellant's assignment of error VI.

■ It is well settled that, while jurors may be permitted to testify as to whether or not any particular act alleged as misconduct on the part of the jurors occurred, or as to the existence of any fact militating against a fair and impartial trial, they are not permitted to give evidence, either orally or by affidavit, upon a motion for a new trial, as to the effect such misconduct, or prejudicial act had upon their minds.

■ The correct rule on this proposition, as stated and approved very generally by the authorities, is as set forth on page 18 of appellant's opening brief. Appellant's counsel has there quoted the same from McPhee v. People, 108 Colo. 530, 120 P. 2d 814, 815, a leading case on the subject, as follows:

"It is well settled that jurors may testify to any fact showing the existence of an outside influence, but they

cannot give evidence as to the effect any such outside influence may have had on their minds in arriving at a verdict. Courts never enter into such fields of conjecture. What they do is to hear the facts and determine as a matter of law the effect reasonably calculated to be produced upon the mind of the juror by such outside influences."

 This rule is stated in somewhat different language, but to the same effect, in 23 C. J. S., sec. 1494, subsec. b Criminal Law, p. 1315, cited on pages 11 and 12 of respondent's brief:

"The affidavits or testimony of jurors are, as a general rule, admissible when offered by the prosecution for the purpose of sustaining the verdict.

"Accordingly the jurors are competent to rebut allegations of bias and jurors are competent to rebut allegations of misconduct; but where the act of misconduct is admitted, it cannot be shown by the jurors that accused suffered no prejudice by reason thereof, as under such circumstances the presumption of prejudice is conclusive. On the same principle, affidavits by jurors that they were not influenced by reading newspaper articles, or by improper arguments of the prosecuting attorney, or by improper evidence or exhibits introduced in the jury room, or that they did not pay any attention to the fact that an instruction delivered to them was marked 'refused' cannot be considered."

The principle is very well explained in the case of Hempton v. State, 111 Wis. 127, 86 N. W. 596, 603.

The affidavits of the jurors, in the instant case, were offered and admitted for the purpose, of course, of proving, or tending to prove, that they were not prejudicially influenced by the fact that the appellant was handcuffed, and permitted to remain handcuffed in the courtroom, during the trial. The influence of seeing a defendant on trial shackled before them, necessarily producing in the beholder's mind at least a strong impression that the person shackled is an outlaw, or criminal of a dangerous type, is subtle and insidious. Through the sense of sight,

it quietly, but none the less effectively, impresses itself upon the subconscious mind and creates there an influence of which the juror himself is probably unaware.

We quote briefly from the opinion in Hempton v. State, supra:

"It does not satisfy the exception for jurors to say that nothing occurred calculated to prejudice them. The court must be able to say that independent of the notions of the guilty parties, and must, before doing so, be satisfied beyond a reasonable doubt that such is the fact, keeping in mind how easily persons may be influenced by their environment without being conscious of it. The reading of the newspaper accounts and comments upon the trial was highly calculated to influence the minds of the jurors."

In State v. Strodemier, 41 Wash. 159, 83 P. 22, 111 Am. St. Rep. 1012, it is said in the opinion:

"In order to avoid the misconduct of this juror, the state filed affidavits of several of the jurors, to the effect that the juror (who went with the bailiff to get a drink) was the last to consent to a verdict of guilty; and it is contended for that reason that the misconduct of the juror was without prejudice. But the rule seems to be that, where misconduct is admitted, jurors cannot be heard to deny its prejudicial influence." (Citing: People v. Chin Non, 146 Cal. 561, 80 P. 681; People v. Stokes, 103 Cal. 193, 196, 37 P. 207, 42 Am. St. Rep. 102; People v. Azoff, 105 Cal. 632, 634, 39 P. 59.)

In People v. Stokes, supra, an apt quotation from Woodward v. Leavitt, 107 Mass. 453, 466, 9 Am. Rep. 49, occurs:

"But where evidence has been introduced tending to show that without authority of law, but without any fault of either party or his agent, a paper was communicated to the jury which might have influenced their minds, the testimony of the jurors is admissible to disprove that the paper was communicated to them, though not to show whether it did or did not influence their deliberations and decisions. A juryman may testify to

any facts bearing upon the question of the existence of the disturbing influence, but he cannot be permitted to testify how far that influence operated upon his mind." [103 Cal. 193, 37 P. 209.]

▉ In view of the fact that the authorities are almost unanimous in excluding from evidence affidavits such as that of the jurors in the instant case (marked "Exhibit C," as a group, and admitted by the trial court), in which they attempted to state their condition of mind and that they were not influenced by the shackling, this court believes that such affidavits are conjectural and are not competent evidence to show the absence of any prejudicial influence upon their minds, as a result of the shackling of the appellant, that they should not have been admitted in evidence by the trial court upon the motion for a new trial, and that their admission was error. Appellant's assignment of error VI was well taken.

Appellant's remaining assignment of error confronts us with the final, decisive question upon this appeal: Did the trial court err in denying appellant's motion for a new trial? The grounds upon which the said motion was made were: "(1) That the verdict was not supported by sufficient evidence, but was contrary to the evidence; (2) that the defendant could not be convicted on the uncorroborated testimony of an accomplice; and (3) that the court's refusal to grant defendant's motion to remove the handcuffs with which defendant was shackled in the courtroom during the entire trial was prejudicial to the defendant and in violation of his constitutional right to a fair and impartial trial before a jury, and that the refusal to grant said motion restrained defendant from the use of his limbs, which confused and embarrassed his mental faculties, and upon the further ground that the court had the sole discretion in determining whether or not the defendant should be shackled and that such shackling was not within the discretion of the sheriff, which reason was given by the court in denying defendant's motion to be released from

his shackles while in the courtroom and during the trial of said defendant."

This court has hereinbefore indicated its opinion as to the sufficiency of the evidence to sustain the verdict, and as to the handcuffing not being, under the facts and circumstances confronting the trial judge at the time of his ruling, an abuse of the court's discretion. In regard to the second ground of the motion, to the effect that the appellant could not be convicted upon the uncorroborated testimony of an accomplice, this ground evidently was based upon the assumption that Kenneth Petsch was an accomplice. The opinion of this court, in regard to that alleged ground of the motion for a new trial, is that there is no evidence in the record justifying even an inference that Kenneth ("Kelly") Petsch was an accomplice. The substance of all evidence relevant to that question clearly establishes that he was not. His action, even though grossly intoxicated at the time, in trying to get between McKay and Flindt and stop the beating of Flindt, his being knocked down by McKay for such interference, the action he took at the first opportunity reasonably available to him to communicate with his friend, Irvin Blanchard, as to what had occurred, his repeated expressions of concern as to Flindt's condition, his action in telling Blanchard what occurred, at his first opportunity away from McKay's hearing, his taking Blanchard and Murray to the scene of the crime, where they found Flindt's dead body, and his early reporting of the facts and circumstances to the police, all tend to prove, and do satisfactorily establish, his innocence as to any complicity whatever in the criminal acts of the appellant. Both the appellant and Petsch testified that Petsch received no part of the money taken from Flindt's body. Petsch was the unfortunate victim of circumstances, in being in the position in which he was in, when the killing occurred.

Taking from the trial court the right to base that court's ruling to any extent upon the evidence contained in the affidavit of Sheriff Ray Root as to prior alleged

offenses of the appellant and as to his alleged efforts to effect an escape, and in the affidavits of the trial jurors to the effect that they were not influenced by seeing the appellant shackled in the courtroom, would the trial court, in ruling upon the motion for a new trial, have ruled as it did, and would it have been justified in so ruling, upon the basis solely of the legal evidence admitted on the trial, and upon the law as applied to such evidence? The functions of the trial court, under the law, when a new trial is requested upon the ground of insufficiency of the evidence to justify the verdict, make it the duty of the trial judge to weigh the evidence with the utmost care and scrutiny, especially when some influence that may have operated prejudicially has had the opportunity to influence the minds of the jurors. The trial judge, in order to test whether or not the verdict is in accordance with justice, fairness and right, and to test, in practical effect, whether or not the trial has been fair and impartial, should determine whether the verdict the jurors have reached is fully justified by the facts and circumstances comprising the evidence and by the law under the court's instructions. If the trial judge correctly finds that it is, this finding negatives the idea that prejudice may have influenced the jurors. It is by their acts in the performance of their duties, proving that they have followed the evidence and the law, and not by anything they may say in affidavits, by which their condition of mind may be judged.

It was, especially, in order that we might determine and demonstrate whether or not the court's ruling, in denying the motion for a new trial, was justified, particularly, in view of the prejudicial influence which might have resulted from permitting the appellant to remain handcuffed in the courtroom in the presence of the jurors, that we have felt impelled to detail, in this opinion, the evidence to an extent rendering the opinion unusually and regrettably voluminous. Notwithstanding the fact that we have found, from the record, substantial evidence to sustain the verdict, we would still

feel it our duty to reverse the judgment if it appeared from the evidence upon the basis of any reasonable hypothesis, that the appellant could have been not guilty of murder in the first degree. If it so appeared, it would then be reasonable to conclude that the shackling had operated, prejudicially, to influence the verdict, and had resulted in denying to appellant a substantial right, namely, the right to a fair and impartial trial. Even though the facts, in our view, justified the court's ruling as to the removal of the handcuffs, at the time such ruling was made, nevertheless, if permitting the handcuffs to remain operated prejudicially, this court, in ruling upon the correctness of the trial court's order in denying the motion for a new trial, should reverse the judgment. Only by a most careful consideration of all the evidence have we been able properly to test the correctness of such ruling.

This court is convinced, from the evidence in this case, after a very careful consideration of all the evidence, as disclosed by the record, and from the proper application of the law to the facts, that the appellant was so clearly and convincingly proven guilty of murder in the perpetration of robbery, that the jurors were fully justified, from the evidence and from that alone, in finding him guilty of murder in the first degree. This court knows there are errors in the record on the part of the trial court in having admitted the affidavit of Sheriff Ray Root and the affidavits of the jurors. Shall we conclude that the trial judge's ruling in denying the motion for a new trial, which was, in our judgment, correct, would not have been reached by him except for the influence of the affidavits erroneously admitted in evidence? We believe that, if he could have been shown at the time he ruled, that these affidavits could not be considered, that, with them removed from the case, he would necessarily have reached the same conclusion he did reach, as would the jurors had the appellant never been in handcuffs before them. This court must presume that the trial court, if that court were ruling with the objectionable

affidavits eliminated, would have done its duty under the evidence, which clearly established the defendant's guilt of murder in the first degree, and, therefore, would have concluded, not only that the evidence was not insufficient to justify the verdict, but was inconsistent with any reasonable hypothesis under which appellant would have been guilty of a lesser offense, or a lesser degree of murder, and that the trial court would have so ruled irrespective of the incompetent evidence erroneously admitted. As to the matters included in the Root affidavit, the appellant had admitted on the trial, in his testimony, having served a sentence in the Utah penitentiary for second degree burglary, and also that he was convicted by court martial for army desertion and had escaped from Lemoore Army Base. The fact of the attempted escape from the Washoe County jail had been testified to at the trial by Edwin Gily. As to these matters there was no conflict in the evidence and no controversy. The affidavit was, therefore, merely cumulative as to all matters therein, except the alleged letter from appellant to one Mary Davis asking her to send him hack saw blades, and the defendant did not contradict that. And the trial judge had stated, upon ruling upon the motion to remove the shackles, that he had knowledge of that fact. As to the affidavits of the jurors that they were not prejudiced by the handcuffing and would have reached the same result irrespective thereof, the court did not need their affidavits in order correctly to reach the conclusion they had not been prejudicially influenced, for the reason that the legal evidence clearly was such that they could not, from that alone, have reached, reasonably, any other conclusion; hence, their affidavits, which were incompetent and have to be excluded to avoid establishing a dangerous precedent as to future cases in which the situation and facts might be different, could add nothing to what the court already must have known by careful comparison of the evidence with the verdict.

This court believes it was the duty of the trial

court to deny the motion for a new trial, and that, under the admitted evidence, his ruling in so doing would have been the same as it was if the affidavits had been eliminated prior to the court's ruling and, therefore, that the erroneous admission in evidence of the Root affidavit and the affidavits of the jurors was immaterial, and had no prejudicial effect upon the result, or upon any right of the appellant.

This court further believes that the verdict, unfortunate as it is from the standpoint of the defendant, was the only verdict which the jury could conscientiously render, if guided solely by the evidence, the law, and the desire to do justice. After an examination of the entire case, it appears that no error complained of, and no error we perceive in the record, has resulted in a miscarriage of justice, or actually prejudiced appellant in respect to a substantial right. Section 619 of "An Act to regulate proceedings in criminal cases in this state and matters with relation thereto," approved March 17, 1911, effective January 1, 1912, said section being section 11266, Nevada Compiled Laws 1929, vol. 5, provides that:

"No judgment shall be set aside, or new trial granted, in any case on the ground of misdirection of the jury or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court to which application is made, after an examination of the entire case, it shall appear that the error complained of has resulted in a miscarriage of justice, or has actually prejudiced the defendant, in respect to a substantial right."

No prejudicial error appearing in the record, the judgment and order appealed from are affirmed, and the district court is directed to make the proper order for the carrying into effect by the warden of the state prison of the said judgment.

## On Petition For Rehearing

March 19, 1946. 167 P. 2d 476.

George Lohse, of Reno, for Appellant.

Alan Bible, Attorney General, George P. Annand and Homer Mooney, Deputy Attorneys General, of Carson City, and Melvin E. Jepson, District Attorney, and Harold O. Taber and C. Lester Zahniser, Assistant District Attorneys, all of Reno, for Respondent.

**OPINION**

By the Court, HORSEY, J.:

In this court's opinion upon the appeal in the instant case, we have treated so fully all matters embodied in the five alleged grounds set forth in appellant's petition for a rehearing, that it would be superfluous and inappropriate to repeat a detailed presentation of them herein.

■ The appellant, in his petition, concedes that there is no unqualified rule prohibitory of shackling, but ridicules the idea that his attempt to escape from the Washoe County jail, on the early morning of January 22, 1944 (two days before the commencement of the trial), was sufficient basis upon which to conclude that there was evident danger of his escape, within the meaning of the qualifying clause of the rule as stated by Sir William Blackstone, quoted on page 408 of 165 P. 2d, and which is as follows: "The prisoner must be brought to the bar without irons or in any manner of shackles or bonds, unless there be evident danger of escape, and then he may be secured with irons." 4 Bl. Com. 332.

On page 7 of the petition for rehearing, it is stated:

"* * * What did the trial court have before it to warrant the denial to appellant of so important a right as to appear before the jury free of all manner of shackles or bonds? The tampering with an inner lock of the jail!"

What are the facts as disclosed by the record? The testimony of Edwin Gily, a deputy sheriff of Washoe County, at the trial, was, substantially, that Gily and one Gray were in the said jail and heard an unusual noise inside the tank; that they sat there and talked a few minutes, and Gily took off his shoes and sneaked over to where he could look inside the tank, and he could see the appellant trying to pry the control box open; that the control box is a lever that opens the main door to the tank, in which the appellant and others were confined; that the appellant had an iron bar, approximately three feet long by three-eighths of an inch wide, and that when the witness looked in, the appellant was prying on the control box; that if he had succeeded in prying the door of the control box open, he might have opened the door of the tank, in which he and others were confined; that he damaged the control box to the extent that they were unable to open it with a key, and that it was bent out of shape, and Gily had to get a locksmith to open it.

This testimony of Gily was uncontradicted by the appellant, although he testified at considerable length at the trial.

On page 45 of this court's opinion upon the appeal in this case, we concluded that the trial court had, at the time of ruling upon the appellant's motion for the removal of the handcuffs, sufficient knowledge and information to justify the conclusion, "that the appellant was, at the time of said ruling, * * * a dangerous and desperate man, and that the sheriff, his deputies and the court were reasonably justified in apprehending that the appellant, if the handcuffs were removed, might at any time, even at the time of the trial, attempt to escape, and that he might resort to any available means of physical violence to accomplish such escape. The appellant,

by his own conduct, was the primary cause of any prejudice his being handcuffed might entail. In view of the exceptional facts and circumstances existing, and within the knowledge of the trial judge, * * * at the time of the ruling, we cannot conscientiously say that the trial court abused its discretion in denying the motion to remove the handcuffs."

We can perceive no error in the conclusion we have thus reached, and no substantial reason is shown why we now should depart from it.

In view of the facts as to appellant's prior criminal record, which he admitted, and as to his attempt to escape from the Washoe County jail on January 22, 1944, the appellant had forfeited the right to be free from handcuffs at his trial. The conclusion of the trial court that he was a desperate and dangerous man was amply warranted by the facts involved in his record. That he was willing, for paltry, selfish gain, to invade the rights of others and take, feloniously, that which did not belong to him, was shown by his conviction of burglary in Utah, and his failure to claim that he had been wrongfully convicted. After being paroled and taken into the armed forces of his country, he evidenced lack of patriotism and loyalty, by deserting, and upon being apprehended and convicted therefor, he disclosed an utter disregard for duly constituted authority, by escaping from the Lemoore Army Base, in California.

■ Furthermore, on the day of the wanton and willful murder of Robert Flindt, by the appellant, he had voluntarily admitted to Chief of Police Fletcher that this cruel killing was for the purpose of robbery; that he dragged Flindt behind the picket fence because he did not want any one to see him rob Flindt, and that he wanted the money to gamble, pay his room rent, and eat. This admission to Chief Fletcher, having occurred in the presence of the district attorney of Washoe County, and others, had undoubtedly become known to the trial judge before he ruled as to removing the handcuffs. As said by Judge Wanamaker, in Barnett v. State, 104 Ohio

St. 298, on page 310, 135 N. E. 647, 651, 27 A. L. R. 351 (quoted on pages 40 and 41 of our opinion upon the appeal in the instant case) : "What we know as men, having common knowledge, * * * we cannot ignore as judges."

In addition to knowledge of this cruel murder of Flindt, which showed appellant bereft of all respect for the rights of others, and even unresponsive to the voice of humanity, the trial judge knew of appellant's said attempt to escape from the Washoe County jail, January 22, 1944, two days before the commencement of his trial, as above set forth.

Could it reasonably be concluded, in view of these facts, that the appellant was other than a desperate criminal, an enemy of human society, utterly untrustworthy and devoid of ordinary sensibility to humane instincts? Could it be believed, in view of the admitted facts, that the appellant was not so completely selfish and ruthless that, in order to gain his liberty, and perhaps his life, he would resort to any desperate means to accomplish his purpose, that might become available to him? The answer is clear. Neither the trial judge, nor the officers in whose charge the appellant was, could be reasonably expected to take undue risks as to their own safety with a man of appellant's character. Because of his own criminal violations of the rights of others, there no longer remained to him any right whatever, under the rule relative to shackling, as universally interpreted, to be free from shackles or bonds at his trial. The ruling of the trial court, therefore, declining to order the removal of the handcuffs from appellant's wrists, deprived the appellant of no substantial right.

Appellant's alleged ground IV, as stated in his petition for rehearing, is as follows: "In denying appellant's motion to have the handcuffs removed, appellant was prejudiced before the jury and was thereby denied his constitutional guarantees to a fair and impartial trial as guaranteed by the Constitution of Nevada and the United States Constitution."

■ It was, precisely, that we might clearly determine whether permitting appellant to be handcuffed before the jury, had *operated prejudicially* to impair his right to a fair and impartial trial, that in considering this case upon appeal, we examined fully and weighed carefully, the evidence as disclosed by the record. We were not required to do this in order to rule upon the question of the sufficiency of the evidence to justify the verdict. We stated, on page 35 of our opinion upon the appeal, the long-established rule in this state in that regard, and cited, in support thereof: State v. Van Winkle, 6 Nev. 340; State v. Mills, 12 Nev. 403; State v. Buralli, 27 Nev. 41, 71 P. 532; State v. Hunter, 48 Nev. 358, 232 P. 778, 235 P. 645; State v. Boyle, 49 Nev. 386, 248 P. 48; and State v. Watts, 53 Nev. 200, 296 P. 26.

Realizing, however, that it was entirely possible that some juror or jurors, observing the appellant handcuffed, could have become thereby prejudiced against him to the extent that they might have convicted upon less evidence, or in a higher degree, than if the handcuffs were not apparent, this court diligently scrutinized and carefully weighed, all of the evidence, with the intention of reversing the judgment unless the evidence was not merely substantial, but sufficient to prove, beyond a reasonable doubt, the guilt of the appellant of murder in the first degree. This intention we stated, on pages 56 and 57 of our said opinion, as follows: "Notwithstanding the fact that we have found, from the record, substantial evidence to sustain the verdict, we would still feel it our duty to reverse the judgment if it appeared from the evidence, upon the basis of any reasonable hypothesis, that the appellant could have been not guilty of murder in the first degree."

Logically, there appears little reason why, in the case of a defendant shackled because of a necessity created by his own misconduct, we should weigh the evidence to a far greater extent, to prevent injustice, than in the case of a defendant not guilty of misconduct of such nature as to render shackling reasonably necessary.

Our only reason for assuming the additional burden of weighing the evidence fully, in order to determine with certainty, that is, beyond a reasonable doubt, the guilt or innocence of appellant of first-degree murder, was that we desired to do all possible, consistent with the proper discharge of the duties of this court, to safeguard the right of one accused of crime, regardless of the enormity of his guilt, to a fair and impartial trial as guaranteed by the constitution and laws of the State of Nevada and the constitution of the United States, and to that end, determine, so far as this court could, whether the shackling had operated prejudicially to produce a result contrary to law and to the just rights of the appellant.

However, Mr. Lohse, the attorney for the appellant, apparently failing to realize the extent to which we went in order to make sure that the verdict finding appellant guilty of murder in the first-degree was fully justified by the evidence, and by that alone, proving his guilt in such degree beyond a reasonable doubt, on page 15 of the petition for rehearing, after quoting the foregoing paragraph from pages 56 and 57 of our said opinion, has stated: "If this is now to be laid down as the law of Nevada, then, would it not follow that any man hereafter tried and found guilty of first degree murder, by substantial evidence to support the verdict, such verdict would stand regardless of any violation of his constitutional rights?"

■ What we stated means just the opposite of counsel's conclusion. We said we would still feel it our duty to *reverse* the judgment, *notwithstanding* we had found *substantial* evidence to sustain the verdict, "if it appeared from the evidence upon the basis of *any reasonable hypothesis,* that the appellant could have been not guilty of murder in the first degree." (Italics ours.)

We would have been justified in reversing the judgment, if the evidence failed to show such guilt of murder in the first degree, beyond a reasonable doubt, upon the theory that the jury, apparently having convicted on less

evidence than they should have required, or in a higher degree than the evidence justified, might have been prejudicially influenced by seeing appellant handcuffed before them.

■ We found, however, after fully and carefully weighing the evidence, that it clearly and convincingly proved the appellant's guilt of murder in the first degree beyond a reasonable doubt.

It follows that, by the verdict of the jury finding. appellant guilty of murder in the first degree, and by the judgment of the trial court pronounced thereon, there was no miscarriage of justice, and that if the jury had not so found, and the trial court so adjudged, justice would have miscarried in appellant's favor.

The jurors having done no more than their sworn duty, it cannot be presumed in favor of appellant that if appellant had been free from handcuffs, they would have done less than their duty, and that they permitted the fact that they observed appellant in handcuffs before them, or any other extrinsic influence, to enter into their deliberations or to influence, to any extent, their verdict. The verdict being right, and in accord with justice, the shackling *did not operate prejudicially* to deprive appellant of any right. (Italics ours.) The appellant, of course, had no right to have justice miscarry in his favor. No person has that right.

We have hereinbefore stated, and in our opinion upon the appeal, in effect held, that the trial court, by its ruling declining to order the handcuffs removed, did not deprive appellant of any substantial right; that the jurors, having reached the only result which they could have reached in accordance with their sworn duty, were not prejudicially influenced by the handcuffing of appellant, and that, by their verdict, they did not deprive him of any substantial right; and that he was accorded a fair and impartial trial within the meaning of the constitution of Nevada, and the constitution of the United States.

On page 14 of the petition for rehearing, it is stated:

"It is earnestly and strongly urged that irrespective of whether the verdict the jurors reached was fully justified by the facts and circumstances comprising the evidence and by the law under the court's instructions, that there is no formula in the law by which it can be determined to what degree the appellant was prejudiced by virtue of his having been handcuffed during his trial.

"In spite of the fact that this Honorable Court believes that there is sufficient evidence to substantiate the verdict, the fact remains, that if the trial court could be said to have correctly found that the verdict was justified, appellant submits that such finding in itself could not logically negative the idea that prejudice may have influenced the jurors, since there is no conceivable yardstick in the law to judge the degree of prejudice in the minds of the jurors. To be able to conclusively determine this question, one would, it is seriously and respectfully submitted, have to possess omnipotent powers!"

■ If by this the appellant means that he has some right beyond the right to be judged only upon competent, relevant and material evidence, and to have properly applied thereto correct principles of law—some fanciful right to play upon the sympathy or credulity of the jurors, and perhaps, by false testimony, and pretended innocence, to endeavor to have them depart from their sworn duty, and thereby defeat justice, and of which the handcuffing may have rendered him less capable, with that we are not concerned.

This court said, in its opinion in State v. Skaug, 63 Nev. 59, 161 P. 2d 708, at page 711: "An aged lady after spending a pleasant social evening with a neighbor, on returning to the shelter of her home alone in the late hours of the night, was set upon by a cold blooded villain and slain under circumstances of revolting atrocity. Besides the death wound inflicted with her husband's revolver, she was brutalized by clubbing, her valuables were stolen and her body left broken and bleeding upon the floor of the ruined home. Hence, in the presence of

such enormous and clearly proven guilt we will not pause to speculate as to whether, if evidence of other offenses had been omitted the jury might have returned a verdict carrying a lesser penalty. Section 11266, N. C. L., prevents a reversal."

In the Skaug case, there had been error in admitting in evidence certain testimony as to other offenses; but this court found, in effect that, notwithstanding such error, the guilt of Skaug of murder in the first degree had been clearly proven by competent evidence, beyond a reasonable doubt, and therefore, there was no miscarriage of justice, nor deprivation of a substantial right.

In the instant case, there was *no* error in declining to order the removal of the handcuffs, for the reasons fully stated herein and in our opinion upon the appeal. The crime committed by the appellant, and of which he has so clearly been proven guilty, was an atrocious and cold-blooded murder. He literally beat and kicked to death, without provocation and without warning, and solely for the purpose of robbery, a man with whom he had pretended social companionship only a short while before. We may well paraphrase, and apply to the instant case, certain language of this court in the Skaug case, as follows: "Hence, in the presence of such enormous and clearly proven guilt we will not pause to speculate as to whether, if 'the handcuffing of appellant' had been omitted the jury might have returned a verdict carrying a lesser penalty. Section 11266 N. C. L. prevents a reversal."

We have quoted fully section 11266, vol. 5, N. C. L., on page 59 of our opinion upon the appeal in the instant case, and it is needless to repeat same herein, but we are bound by its provisions, as we were in the Skaug case.

Rehearing denied.